UNITED STATES of America,
Plaintiff-Appellee,

v.

422,978 SQUARE FEET OF LAND, IN the CITY AND COUNTY OF SAN FRANCISCO, and Unknown Owners, Defendants,

State of California, Defendant and Appellant.

No. 23888.

United States Court of Appeals, Ninth Circuit.

July 21, 1971.

As Modified on Denial of Rehearing Aug. 23, 1971.

Wayman M. Robertson, Jr., Asst. Atty. Gen. (argued), Evelle J. Younger, Atty. Gen., San Francisco, Cal., for defendant-appellant.

Edmund B. Clark, Atty., Dept. of Justice (argued), Shiro Kashiwa, Asst. Atty. Gen., Washington, D. C., James L. Browning, U. S. Atty., J. Harold Weise, Asst. U. S. Atty., San Francisco, Cal., for plaintiff-appellee.

Before CHAMBERS, BROWNING and CARTER, Circuit Judges.

JAMES M. CARTER, Circuit Judge:

This is an appeal from an order of the district court dismissing a complaint in condemnation. The State of California appeared in the action as an owner claiming rights in the subject property and resisted the motion of the United States to dismiss. The State's appeal raises questions of whether the United States exercised a navigational easement in connection with the subject property and whether the statute of limitations under the Tucker Act ran against the State. We affirm.

On November 18, 1940, the United States entered and took physical possession of submerged lands in San Francisco Bay, including a wharf facility, then designated Facility No. 70, located on the submerged land and owned by the State. Possession of the land was taken for use of the United States in connection with the San Francisco Naval Shipyard, designated Facilities No. 68 and 70, it was constructing on adjacent uplands.[1]

---

1. The United States purchased title to certain uplands adjacent to the property in question and made extensive improvements on the uplands property. The State contended that the United States had constructed improvements extending onto property owned by the State and that a survey in April of 1943 confirmed this fact. The State requested an admission that the United States constructed facilities on the subject property under the mistaken belief that the facilities were on the upland property that it had purchased. The United States denied this request for an admission. We think, however, that by other requests and answers the United States has admitted that Facilities No. 68 and 70 extended onto the submerged lands in question.

Requests for Admissions were filed by the United States. Request No. 1 asked the State to admit: "The land the subject of this action is situate below the ordinary high water line of San Francisco Bay and underlies the navigable waters of said Bay." The State answered as follows: "The last survey made by defendant of subject property is dated July 21, 1953. As of that time and all times prior thereto the real property described in this action was situate bayward of the line of mean high tide of San Francisco Bay and was tide and submerged lands underlying the Bay." Request No. 2 asked the State to admit: "All of the improvements situate upon the subject property, commonly known as facility No. 68–70 were constructed by the United States and are the property of the United States." The State answered as follows: "[The State] admits that the plaintiff, through its agents, constructed improvements on the subject property at some time or times subsequent to November 18, 1940. On that date defendant also had facilities on the subject property which were likewise known as Facilities 68 and 70."

The United States admitted that "the State of California had a wharf facility on the property when it was taken over by the [United States] on or about No-

In 1944, the State requested that the United States enter into a lease providing for payment of rental for its occupancy of the property. In the ensuing communications concerning a lease, the United States refused to agree to anything more than a nominal rental.[2] The United States remained in possession without entering into a lease or paying rent until October 2, 1967, when it sold Facilities No. 68 and 70, but not the submerged land, to the State for $3,200,-000.[3]

During the period the United States was in possession of the subject property, the State never brought an action

---

vember 18, 1940" and that some time after that date the United States "rebuilt and reconstructed and enlarged facilities already existing on the subject property."

2. Negotiations for a lease between the harbor authorities and the United States, acting through the 12 Naval District, continued from March 8, 1944, at least through July 9, 1954. On July 8, 1947, the 12th Naval District wrote to the Board of State Harbor Commissioners enclosing a proposed lease, which provided for a rental of $120 per annum and stated that upon the execution of the lease by the State it would be forwarded to the Chief of the Bureau of Yards and Docks, Navy Department, Washington, D.C. for final approval and execution. The lease was executed by the Harbor Commissioners and forwarded to the 12th Naval District on July 15, 1947. On March 1, 1948, however, the lease was redrafted by the United States and returned. The covering letter indicated, "An additional paragraph 6 has been inserted in the new draft releasing the Government from any claims arising out of destruction and removal of the wharf in place at the time the Government took possession." Paragraph 6 in the amended lease indicated that the wharf referred to was the one "then designated as facility No. 70."

A letter dated December 15, 1949 indicates that the Board of State Harbor Commissioners requested a reconsideration of the suggested rental of $120 per annum. On August 17, 1951, the 12th Naval District wrote, "The Board of State Harbor Commissioners then refused to accept this lease and has since claimed rental at various rates ranging from $401.80 per month to $25,378.68 per year." The last correspondence in the record, dated July 9, 1954, indicates that no agreement had been reached by the parties.

3. In this case, the State has claimed the right to compensation for the fair rental value of the subject property for this 27-year period, plus the cost of removing the facilities constructed by the United States. The claim of the State, as indicated by its pretrial statement is as follows:

"3. This defendant claims (1) the fair rental value of the subject property during the period November 1940 through November 1967, and (2) damages equal to the reasonable cost of removing the structures constructed by the United States."

"7. The following issues of fact remain to be tried: (1) the fair rental value of the subject property during the period November 1940 through November 1967, and (2) the reasonable cost of removing the aforesaid structures from the subject property."

The record indicates that at the time the Government went into possession on November 18, 1940 there was a pier or structure, known as Facility No. 68 [or 70?], owned by the State on the subject property; that the United States removed the pier and constructed major facilities, which were known as Facilities No. 68 and 70; and that the United States sold the facilities it had constructed to the Port Authority for $3,200,000 and terminated its use on October 2, 1967.

We do not have in the record detailed facts concerning the purchase by the Port Authority of Facilities No. 68 and 70, but it seems to us that there may be no remaining issue pending as to the cost of removal of any structure since the Port Authority would not have paid the United States $3,200,000 for the facilities in October, 1967 and then claimed they should be removed at the expense of the United States. It also seems possible to us that any claim of the State for the old Facility 68 [or 70?] that was removed by the United States was cancelled as part of the deal in which the Port Authority acquired new Facilities 68 and 70. Thus, all that the United States took, for which a claim remains, may be for the use of a portion of San Francisco Bay. We do not, however, turn our decision in any way upon these possibilities. If we are wrong in our assumptions, the claim of the State for the value of the old pier that existed on the property, and for the cost of the removal of

to recover compensation. On March 9, 1955, the United States filed a condemnation action against the property of which it was in possession, designating the interest to be acquired as "a term for years beginning March 9, 1955, and ending June 30, 1955, extendible yearly thereafter until June 30, 1965." Neither a declaration of taking nor an order of possession was filed pursuant to the complaint. The State appeared in the action,[4] and the United States filed an amended complaint on March 22, 1960 and sought dismissal of the action with prejudice to the State's right to recover compensation or, in the alternative, judgment declaring that the United States took possession in exercise of its navigation servitude, for which no compensation was required to be paid.

On August 31, 1964, the United States moved to dismiss the complaint with prejudice to any claim the State had to compensation[5] or, in the alternative, for judgment that the United States had taken possession of the property in exercise of its navigational servitude, for which no compensation was payable. On June 1, 1965, the district court, finding that the United States had not shown "clear congressional authorization" for the exercise of the navigation servitude, denied the motion[6] and the subsequent request by the United States for a recitation permitting interlocutory appeal.

On July 17, 1968, the United States again moved to dismiss the complaint or, in the alternative, for summary judgment determining the State to be entitled to no compensation, on the ground that any claim the State had to compensation was barred by its failure to sue under provisions of the Tucker Act, 28 U.S.C. §§ 1346(a) (2) and 1491, within its six-year period of limitation, 28 U.S. C. §§ 2401 and 2501.

The district court entered an order on November 14, 1968 dismissing the complaint in condemnation without comment. The State's appeal presents two major questions: (1) Is the State of California entitled to compensation for the use by the United States of submerged land in San Francisco Bay, in connection with a

---

Facilities 68 and 70 as they may now encroach upon State land, is disposed of under Part II of this opinion.

4. On the same day that the United States filed the action, it also filed notice of the action, which was served on the State of California on March 15, 1955. The State did not file an answer but, on May 17, 1956, filed and served a "Demand for Trial by Jury," after which it participated in discovery and resisted motions made by the United States.

Although there was not a strict compliance by the State with Rule 71A(e), Federal Rules Civ. Procedure, we think the demand for jury trial was sufficient compliance. The United States makes no contrary contention.

5. Rule 71A Fed.Rules of Civ.Procedure provides in part as follows:

"(i) Dismissal of Action.

(1) As of Right. If no hearing has begun to determine the compensation to be paid for a piece of property and the plaintiff has not acquired the title or a lessor interest in or *taken possession*, the plaintiff may dismiss the action as to that property, without an order of the court, by filing a notice of dismissal * * *.

(2) By Stipulation. Before the entry of any judgment vesting the plaintiff with title or a lesser interest in or possession of property, the action may be dismissed in whole or in part, without an order of the court, as to any property by filing a stipulation of dismissal by the plaintiff and the defendant affected thereby; * * *

(3) By Order of the Court. At any time before compensation for a piece of property has been determined and paid and after motion and hearing, the court may dismiss the action as to that property, except that it shall not dismiss the action as to any part of the property of which the plaintiff has taken possession or in which the plaintiff has taken title or a lesser interest, but shall award just compensation for the possession, title or lesser interest so taken. * * * " [Emphasis added]

6. We do not have for review the order denying this motion to dismiss. We discuss below the problem raised by the motion, however, since we are free to base our decision on any ground shown by the record.

naval shipyard, or did the United States exercise a navigational easement over such land? (2) Where the United States in 1940 took possession of property owned by the State, is any right that the State had to compensation barred by its failure to bring an action under the Tucker Act within six years?

I

The United States contends that the State is not entitled to compensation for the Government's use of submerged land in San Francisco Bay in connection with a naval industrial shipyard. Its argument that the owner of land under navigable waters does not have a compensable right as against the United States for use of such submerged land for a navigation purpose is supported by language in a long line of opinions of the Supreme Court.[7]

■ The State argues that none of these cases involved the precise issue be-

7. In *Scranton v. Wheeler*, 179 U.S. 141, 163–164, 21 S.Ct. 48, 57, 45 L.Ed. 126 (1900), which held that construction by the United States of a long pier on submerged lands that blocked access to the deep water of a river did not result in a compensable taking of that access, the Court stated:

"So that whether the title to the submerged lands of navigable waters is in the State or in the riparian owners, it was acquired subject to the rights which the public have in the navigation of such waters. The primary use of the waters and the lands under them is for purposes of navigation, and the erection of piers in them to improve navigation for the public is entirely consistent with such use, and infringes no right of the riparian owner. Whatever the nature of the interest of a riparian owner in the submerged lands in front of his upland bordering on a public navigable water, his title is not as full and complete as his title to fast land which has no direct connection with the navigation of such water. It is a qualified title, a bare technical title, not at his absolute disposal, as is his upland, but to be held at all times subordinate to such use of the submerged lands and of the waters flowing over them as may be consistent with or demanded by the public right of navigation. * * *

[T]he plaintiff frankly states that compensation cannot be demanded for the appropriation of the submerged lands in question, and in that the United States under the power to regulate commerce has an unquestioned right to occupy them for a lawful purpose and in a lawful manner. This must be so,—certainly in every case where the use of the submerged lands is necessary or appropriate in improving navigation."

The decision in *Scranton v. Wheeler* was affirmed, and much of the above language was repeated in *United States v.*

*Chandler-Dunbar*, 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063 (1913), which held that a power company that owned land adjoining a navigable river did not have a compensable interest in the water power capacity of the river. The Court in *Chandler-Dunbar* stated:

"This title of the owner of fast land upon the shore of a navigable river to the bed of the river, * * * is subordinate to the public right of navigation, and however helpful in protecting the owner against the acts of third parties, is of no avail against the exercise of the great and absolute power of Congress over the improvement of navigable rivers. That power of use and control comes from the power to regulate commerce between the States and with foreign nations. It includes navigation and subjects every navigable river to the control of Congress. All means having some positive relation to the end in view which are not forbidden by some other provision of the Constitution are admissible. If, in the judgment of Congress, the use of the bottom of the river is proper for the purpose of placing therein structures in aid of navigation, it is not thereby taking private property for a public use, for the owner's title was in its very nature subject to that use in the interest of public navigation. If its judgment be that structures placed in the river and upon such submerged land are an obstruction or hindrance to the proper use of the river for purposes of navigation, it may require their removal and forbid the use of the bed of the river by the owner in any way which in its judgment, is injurious to the dominant right of navigation." 229 U.S. at 62, 33 S.Ct. at 671.

"But every such structure in the water of a navigable river is subordinate to the right of navigation, and subject to the obligation to suffer the consequences of the improvement of

navigation, and· must be removed if Congress, in the assertion of its power over navigation, shall determine that their continuance is detrimental to the public interest in the navigation of the river." 229 U.S. at 70, 33 S.Ct. at 675.

"The qualified title to the bed of the river affords no ground for any claim of a right to construct and maintain therein any structure which Congress has, by the act of 1909, decided in effect to be an obstruction to navigation, and a hindrance to its plans for improvement. That title is absolutely subordinate to the right of navigation, and no right of private property would have been invaded if such submerged lands were occupied by structures in aid of navigation, or kept free from such obstructions in the interest of navigation." 229 U.S. at 72, 33 S.Ct. at 675.

Scranton v. Wheeler and *Chandler-Dunbar* were followed in Lewis Blue Point Oyster Cultivation Co. v. Briggs, 229 U.S. 82, 33 S.Ct. 679, 57 L.Ed. 1083 (1913), which held that deepening, in the interest of navigation, a channel across a navigable bay and thereby destroying oysters cultivated by a lessee of the owner of the fee of a large portion of the bed of the bay was not a compensable taking. The Court stated:

"If the public right of navigation is the dominant right, and if, as must be the case, the title of the owner of the bed of navigable waters holds subject absolutely to the public right of navigation this dominant right must include the right to use the bed of the water for every purpose which is in aid of navigation. This right to control, improve, and regulate the navigation of such waters is one of the greatest of the powers delegated to the United States by the power to regulate commerce. * * *

"By necessary implication from the dominant right of navigation, title to such submerged lands is acquired and held subject to the power of Congress to deepend the water over such lands, or to use them for any structure which the interest of navigation, in its judgment, may require." 229 U.S. at 87-88, 33 S.Ct. at 680.

*Chandler-Dunbar* and Lewis Blue Point Oyster Cultivation Co. v. Briggs were relied on to support the following statement in United States v. Chicago, M., St.P. & P.R.R., 312 U.S. 592, 599, 61 S.Ct. 772, 776, 85 L.Ed. 1064 (1941), which held that the United States did not have to compensate a riparian owner for injury to structures located between high and low water marks that was caused by the raising of the water level in a navigable stream for the improvement of navigation:

"It is not true, as respondents maintain, that only structures in the bed of a *navigable stream which obstruct* or adversely affect navigation may be injured or destroyed without compensation by a federal improvement of navigable capacity. On the contrary, any structure is placed in the bed of a stream at the risk that it may be so injured or destroyed; and the right to compensation does not depend on the absence of physical interference with navigation."

The Court also stated:

"Whether, under local law, the title to the bed of the stream is retained by the State or the title of the riparian owner extends to the thread of the stream, or, as in this case, to low water mark, the rights of the title holder are subordinate to the dominant power on the federal Government in respect of navigation.

\* \* \* \*

"The dominant power of the federal Government, as has been repeatedly held, extends to the entire bed of a stream, which includes the lands below ordinary high water mark. The exercise of the power within these limits is not an invasion of any private property right in such lands for which the United States must make compensation. The damage sustained results not from a taking of the riparian owner's property in the stream bed, but from the lawful exercise of a power to which that property has always been subject." 312 U.S. at 596-597, 61 S.Ct. at 775. (citations omitted).

In United States v. Commodore Park, 324 U.S. 386, 65 S.Ct. 803, 89 L.Ed. 1017 (1945), which held that the United States was not required to compensate an owner of property contiguous to a creek whose land was decreased in value because the United States destroyed the creek's navigability by depositing materials dredged from a bay in the creek, the Court stated:

"United States v. Chicago, M. St. P. & P. R. Co., 312 U.S. 592, 596-598, [61 S.Ct. 772, 775, 776, 85 L.Ed. 1064] set at rest any remaining doubt concerning the dominant power of the government to control and regulate navigable waters in the interest of commerce, without payment of compensation to one who under state law may

fore us but involved questions of the compensability of private interests in the flow of navigable streams. We will not, however, refuse to follow such an often repeated and enduring expression of the law by the Supreme Court, absent an indication that the Court would reconsider its remarks should the issue come before it. We hold that the United States can use land submerged beneath navigable waters for a navigational purpose without compensating the owner of the land.

The State contends that the power of the United States to use submerged land for a navigational purpose was not invoked in this case because there was no express congressional authorization for the exercise of this power and possession of the subject property was not, in fact, taken for a navigational purpose. These contentions are not persuasive in light of United States v. Commodore Park, 324 U.S. 386, 65 S.Ct. 803, 89 L.Ed. 1017 (1945). There the Navy Department acting in conjunction with the War Department, enlarged and improved a Nav-

al Air Station with shore facilities for seaplanes by dredging an adjacent bay to a depth suitable for the operation of large seaplanes. The dredged materials were deposited in a navigable creek adjacent to the bay, cutting off the creek from any navigable outlet to the bay and sea.

The project, in *Commodore Park*, was authorized by a statute that did not recite a navigational purpose. Further, the plan originated with a view to improvement of shore facilities by expanding the base onto the dredged materials deposited in the creek. Nevertheless, the Court held applicable the rule of nonliability for the exercise of a navigational easement.

"The 'fact that purposes other than navigation will also be served could not invalidate the exercise of the authority conferred, even if those other purposes would not alone have justified an exercise of Congressional Power.' Arizona v. California, 283 U.S. 423, 456 [51 S.Ct. 522, 526, 75 L.Ed. 1154].

---

hold 'technical' legal title (as between himself and others than the government) to a part of the navigable stream's bed." 324 U.S. at 390, 65 S.Ct. at 805.

"There is power to block navigation at one place to foster it at another. Whether this blocking be done by altering the stream's course, by lighthouses, jetties, piers, or a dam made of dredged material, the government's power is the same and in the instant case is derived from the same source— its authority to regulate commerce." 324 U.S. at 393, 65 S.Ct. at 806.

In United States v. Virginia Electric and Power Co., 365 U.S. 624, 628, 81 S.Ct. 784, 788, 5 L.Ed.2d 838 (1961) the Court stated:

"Since the privilege or servitude only encompasses the exercise of this federal power with respect to the stream itself and the lands beneath and within its high-water mark, the Government must compensate for any taking of fast lands which results from the exercise of the power."

In United States v. Rands, 389 U.S. 121, 123, 88 S.Ct. 265, 267, 19 L.Ed.

2d 329 (1967), which held that the compensation the United States was constitutionally required to pay when it condemns riparian land does not include the land's value as a port site, the Court said:

"This power to regulate navigation confers upon the United States a 'dominant servitude', FPC v. Niagara Mohawk Power Corp., 347 U.S. 239, 249 [74 S.Ct. 487, 493, 98 L.Ed. 686] (1954), which extends to the entire stream and the stream bed below ordinary high-water mark. The proper exercise of this power is not an invasion of any private property rights in the stream or the lands underlying it, for the damage sustained does not result from taking property from riparian owners within the meaning of the Fifth Amendment but from the lawful exercise of a power to which the interests of riparian owners have always been subject. United States v. Chicago, M. St. P. & P. R. Co., 312 U.S. 592, 596– 597 [61 S.Ct. 772, 775, 85 L.Ed. 1064] (1941) ; Gibson v. United States, 166 U.S. 269, 275–276 [17 S.Ct. 578, 580, 41 L.Ed. 996] (1897)."

"All the waters affected were navigable. The Constitution entrusted to Congress the responsibility of determining what obstructions may, or may not, be placed in such waters. This power Congress may exercise itself or through its duly authorized agents. Here, the War Department, selected by Congress to pass upon when and to what extent, navigable waters may be altered or obstructed, permitted, and actually supervised, the program accomplished. Even though cases might arise in which the courts would look behind the judgment of this specifically authorized agency, this is not such a case." 324 U.S. at 391–392, 65 S.Ct. at 806.

The State argues that a contrary result is compelled in this case by United States v. Gerlach Live Stock Co., 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231 (1950) and Federal Power Commission v. Niagara Mohawk Power Corp., 347 U.S. 239, 74 S.Ct. 487, 98 L.Ed. 686 (1954). We disagree. "The legislative history and construction of particular enactments may lead to the conclusion that Congress exercised less than its constitutional power, fell short of appropriating the flow of the river to the public domain, and provided that private rights existing under state law should be compensable or otherwise recognized. Such were United States v. Gerlach Live Stock Co., supra, and Federal Power Commission v. Niagara Mohawk Power Corp., supra." United States v. Twin City Power Co., 350 U.S. 222, 225, 76 S.Ct. 259, 261, 100 L.Ed. 240 (1956).

■ Here, the record shows Congressional authority under the Act of July 19, 1940, 54 Stat. 779 which authorized the expenditure of moneys for "essential equipment and facilities at either private or naval establishments" for building naval vessels. Pursuant to this authority funds were appropriated by the "Second Supplemental National Defense Appropriation Act" of 1941, 54 Stat. 872, 882. The Secretary of the Navy then recommended the project here involved and the President approved.

Neither here, nor in *Commodore Park* were there statutory provisions that aid to navigation or use of rights of navigation were relied upon. However, we may look to the project to determine whether it was intended as in aid to navigation and commerce. The parallel between *Commodore Park* and our case is very close.

## II

■ Even if the United States were obligated to compensate the State for use of the subject property, the State's right to recover compensation was extinguished by its failure to bring an action within six years of the date the United States took permission of the property.

Under 28 U.S.C. § 1491, the Court of Claims has jurisdiction of "any claim against the United States founded either upon the Constitution * * * or any * * * implied contract with the United States." The district courts have concurrent jurisdiction of such claims not exceeding $10,000, under 28 U.S.C. § 1346(a) (2). Under 28 U.S.C. §§ 2401 (action in the district court), and 2501 (proceeding in the Court of Claims) these claims are barred unless brought within six years after they first accrue. The sections above and §§ 1496, 1497, 1501, 1503 and 2402 of Title 28 U.S.C., are generally referred to as the *Tucker Act*.

■ The claim of the State in this case derives from the proscription of the Fifth Amendment against taking of property without just compensation. The United States can exercise its power of eminent domain by taking physical possession of property without formal proceedings; when it does so, the property owner has a remedy under the above statutes, the Tucker Act, to recover just compensation. United States v. Lynah, 188 U.S. 445, 23 S.Ct. 349, 47 L.Ed. 539 (1903); Hurley v. Kincaid, 285 U.S. 95, 52 S.Ct. 267, 76 L.Ed. 637 (1932); United States v. Dickinson, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947); United States v. Dow, 357 U.S. 17, 78 S.

Ct. 1039, 2 L.Ed.2d 1109 (1958). "The usual rule is that if the United States has entered into possession of the property prior to the acquisition of title, it is the former event which constitutes the act of taking." United States v. Dow, *supra*, 357 U.S. at 22, 78 S.Ct. at 1044. See also, Intertype Corp. v. Clark-Congress Corp. (7 Cir. 1957), 240 F.2d 375. In this case, for the purposes of the statute of limitations under the Tucker Act, the taking, if any, occurred and the limitations period began to run when the United States began its physical possession of the subject property. The State's claim under the Tucker Act was barred by its failure to bring it within six years of this date.

■ The State argues that it never had a claim for relief under the Tucker Act, when the United States merely took possession because there appeared to be less than a taking of the fee, the interest taken was not defined and the United States could have abandoned the property. To the contrary, the state had a claim for relief under the Tucker Act whether the taking was permanent or temporary, even if there was ambiguity. United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946). "[T]he possibility of such an abandonment exists whenever the Government enters into possession of property without filing a declaration of taking and without otherwise providing compensation for acquisition of the title. In any event, such an abandonment does not prejudice the property owner. It merely results in an alteration in the property interest taken—from full ownership to one of temporary use and occupation. * * * In such cases compensation would be measured by the principles normally governing the taking of a right to use property temporarily." United States v. Dow, supra, 357 U.S. at 26, 78 S.Ct. at 1046 (citations omitted). "[W]here * * * the property owner resorts to the courts * * * to recover compensation for what actually has been taken * * * and it appears that less than the whole has been taken

and is to be paid for, such a right or interest will be deemed to pass as is necessary fairly to effectuate the purpose of the taking * * *". United States v. Cress, 243 U.S. 316, 329, 37 S.Ct. 380, 385, 61 L.Ed. 746 (1917).

■ No circumstances in this case required postponement of the necessity of bringing suit or making claim. Unlike the taking in United States v. Dickinson, supra, where the Court held a suit for a taking, resulting from a continuous process of physical events, need not be undertaken until the situation stabilized, the taking here resulted from a single event, entering into possession. Unlike the taking in Oro Fina Consolidated Mines v. United States (1950), 92 F.Supp. 1016, 118 Ct.Cl. 18, the duration of the taking here was not dependent upon the continuation of an external event such as war. The United States began possession in 1940 and did not terminate it until 1967. The negotiations did not toll the Tucker Act period of limitations. Fattore v. United States (1963), 312 F.2d 797, 800, 160 Ct.Cl. 666.

■ The State contends that, even if it is barred from recovering under the Tucker Act, its right to compensation in the condemnation proceeding initiated by the United States in 1955 in the district court is unaffected. We disagree and hold that the running of the Tucker Act period of limitations precluded the State from recovering in the condemnation proceedings.

■ Filing the complaint in condemnation did not alone constitute a taking, 23 Tracts of Land, etc. v. United States (6 Cir. 1949), 177 F.2d 967, 970; United States v. 237,500 Acres of Land (S. D.Cal.1964), 236 F.Supp. 44, 46, aff'd sub nom. United States v. American Pumice Co. (9 Cir. 1968), 404 F.2d 336, but was only a method of adjudicating the contention of the United States that the State was not entitled to compensation. United States v. 93.970 Acres, 360 U.S. 328, 79 S.Ct. 1193, 3 L.Ed.2d 1275 (1959); United States v. San Geronimo

Development Co. (1 Cir. 1946), 154 F.2d 78, cert. den. 329 U.S. 718, 67 S.Ct. 50, 91 L.Ed. 623 (1946); United States v. Turner (5 Cir. 1949), 175 F.2d 644, cert. den. 338 U.S. 851, 70 S.Ct. 92, 94 L.Ed. 521 (1949).

At the time of filing the condemnation action in 1955, neither a declaration of taking nor an order of possession was filed pursuant to the complaint. The United States had been in possession since 1940 and the six year statute of limitation had long run. There is no merit to the contention that the filing of the complaint in condemnation prevented the Government from asserting the defense of the statute of limitations.

, The judgment is affirmed.