# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

-------------------------------
No. 99-30187
-------------------------------

UNITED STATES OF AMERICA;
        Plaintiff-Appellee-Cross-Appellant,

v.

LAND; ET AL.,
        Defendants,

CRIS REALMS, INC.,

        Claimant-Appellant-Cross-Appellee,

UNITED STATES OF AMERICA;
        Plaintiff-Appellee-Cross-Appellant,

v.

LAND; ET AL.,
        Defendants,

RONALD J. ISAAC, ET UX; BETTY PERRIN  ISAAC,
        Defendants-Appellants-Cross-Appellees,

UNITED STATES OF AMERICA;
        Plaintiff-Appellee-Cross-Appellant,

v.

LAND; ET AL.,
        Defendants,

CRISTINA INVESTMENT CORPORATION;

Defendant-Appellant-Cross-Appellee.

------------------------------------------------------
Appeals from the United States District Court
for the Eastern District of Louisiana
------------------------------------------------------

May 31, 2000

Before DAVIS, CYNTHIA HOLCOMB HALL,[*] and SMITH, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:


To resolve the instant case we must determine whether a landowner's damages in a condemnation suit can be adjusted to reflect a prior regulatory taking by the Government where the landowner's efforts to be compensated for that regulatory taking via a separate inverse condemnation suit have already failed. We answer that question in the negative, holding that a landowner who has lost an inverse condemnation claim may not use the compensation phase of subsequent condemnation proceedings to make an "end run" around res judicata and the Tucker Act's statute of limitations. We affirm in part, reverse in part, and remand for further proceedings.

------------------------------

[*]Senior Circuit Judge, U.S. Court of Appeals, Ninth Circuit, sitting by designation.

2

I.

The United States filed the instant condemnation suit to acquire the land in question in 1994. But in order to understand the unusual nature of this case it is necessary to recount a sequence of events that began more than two decades earlier. In August of that 1972, Congress appropriated funds to study the feasibility of creating a national park in the Barataria Marsh, a wetlands area located along the Mississippi River. That same month, the Bayou Des Familles Development Corporation ("BDF") acquired 2,182.62 acres of land in the marsh. BDF planned to develop residential communities on the land, so it subdivided and sold the land to various parties. Among those who presently own land formerly owned by BDF are the three Appellants - Cross-Appellees in this case: Cris Realms, Inc., Ronald J. and Betty Perrin Isaac, and Cristina Investment Corporation (collectively "Landowners").

In order to make the larger property suitable for residential development, BDF planned to construct a levee, which would allow for drainage of the wetlands and protect the property from storm surges. BDF began construction of the levee without obtaining construction permits from the Army Corps of Engineers ("Corps"). In October of 1973, the Corps advised BDF to cease work on the levee pending a determination by the Corps of whether the permits were required by 33

U.S.C. § 1344 and 33 U.S.C. § 403. BDF proceeded with the levee construction anyway, prompting the Corps to issue a cease and desist order in January of 1974, after 90 percent of the levee had been completed. BDF was subsequently fined $25,000 and required to obtain the requisite permits from the Corps before continuing construction. BDF filed a permit application in April of 1975 and a draft environmental impact statement in June of 1975.

The Corps indicated an inclination to deny BDF's permit application in December of 1975, citing, inter alia, strong opposition from the Environmental Protection Agency, the National Marine Fisheries Service, the U.S. Fish and Wildlife Service, the State Parks and Recreation Commission, and the State Planning Office. The Corps noted concerns expressed in BDF's environmental impact statement that draining the land for development would decimate the habitat of many species of wildlife, including that of an endangered alligator. Over the next several years, BDF's permit application remained in a state of limbo because of uncertainty concerning the construction of a nearby hurricane-protection levee and the status of the proposed national park in the Barataria Marsh. Finally, in 1979, after Congress created Jean Lafitte Park in the marsh area, the Corps denied BDF's permit application. In denying the permit, the Corps pointed to several aforementioned general environmental concerns along with fears that the levee

4

would adversely impact the new Park. The Corps also noted public and governmental agency opposition to the construction of the levee.

The congressional legislation creating Jean Lafitte Park established a 8,600-acre "core area," which would comprise the park itself, and a 11,400-acre "park protection zone." The statute authorized the Department of the Interior to acquire land within the park protection zone, but only if state and local authorities failed to enact or enforce protective regulations governing the use of land within the zone. All three of the parcels subject to condemnation in this case fell within the park protection zone.

On November 2, 1979, BDF filed suit in federal district court to enjoin the Corps' denial of the permit application. See Bayou des Familles Dev. Corp. v. United States Corps of Eng'rs, 541 F. Supp. 1025 (E.D. La. 1982). In this suit, BDF alleged, inter alia, that the permit denial constituted an uncompensated taking. The district court dismissed this claim for lack of jurisdiction, noting that the Court of Claims would have exclusive jurisdiction over such a claim under the Tucker Act, 28 U.S.C. § 1491. See id. at 1042.

BDF filed an inverse condemnation suit in the United States Claims Court on

July 25, 1991.[1]  That suit was joined by Landowners Ronald and Betty Isaacs.  The court dismissed the suit as time-barred by the Tucker Act's six-year statute of limitations.  See Bayou des Familles Dev. Corp. v. United States, 130 F.3d 1034, 1037 (Fed. Cir. 1997).  The Federal Circuit affirmed on this basis, holding that any takings claim had become ripe in 1979, and therefore must have been filed by 1985.  See id. at 1040.  The other Landowners in this case filed an inverse condemnation suit on February 21, 1995, and that suit was similarly dismissed as time-barred.  See Cristina Inv. Corp. v. United States, 40 Fed. Cl. 571, 579-80 (1998), appeal dismissed, 155 F.3d 570 (Fed. Cir. 1998).

Related litigation proceeded in the Louisiana state courts as well.  In 1986 Jefferson Parish sought and obtained permission from the Corps to build a hurricane-protection levee, proposing a location that differed from that proposed by BDF.  BDF and Landowners refused to provide land for the Corps-approved levee, which would have left most of Landowners' land on the unprotected side of the levee (and hence, unsuitable for residential development).  Accordingly, the West Jefferson Levee District filed condemnation suits against Landowners, seeking to

---

[1]  In 1982 the United States Claims Court became the successor to the United States Court of Claims's original jurisdiction.  In 1992 the United States Claims Court became the United States Court of Federal Claims.

6

acquire (for $500 per acre) 16.16 acres from Landowner Cris Realms, Inc., 19.56 acres from Landowner Cristina Investment Corp., and 44.96 acres from Landowners the Isaacs. Landowners sought much higher compensation for their land, arguing that the District should pay them what their land would be worth were it suitable for development. The trial court agreed and a court of appeals affirmed. The Louisiana Supreme Court reversed, holding that Landowners were unable to develop their property because of "the property's location inside of the park protection zone of Jean Lafitte Park and because of the growing national policy toward the more stringent preservation of wetlands." West Jefferson Levee Dis. v. Bayou des Familles Dev. Corp., 640 So.2d 1258, 1284 (La. 1994). The court remanded for a recalculation of damages based on the undevelopable value of the land.

Pursuant to 16 U.S.C. § 230a(c), the Federal Government could only acquire land in the park protection zone if the parish governments proved unwilling to enact land-use regulations that would adequately protect the ecosystem of the Park's core. In 1994, after unsuccessfully attempting to convince Jefferson Parish to enact such land-use regulations, the National Park Service filed condemnation complaints seeking to acquire the "park protection zone" properties at issue in this case. The Park Service valued the property at approximately $300 per acre, based on the land being unsuitable for residential development. Landowners insisted that they should

7

be compensated for the value of the land based on an assumption that all the land would be suitable for such development. This assumption yielded an appraisal of approximately $16,000 per acre.

After a bench trial, the district court sided with Landowners on the valuation question, determining that Landowners were entitled to receive compensation based upon the value of the land if suitable for development. The court determined that because the Government's actions in denying the permit rendered the condemned property unsuitable for development, the Government was liable for what that land would have been worth had the levee been built at the location proposed by BDF.

The district court also refused to award severance damages for property that was in the right of way of the (approved) hurricane-protection levee, and which had been condemned by the state Levee District. But the district court did award Landowners severance damages to compensate them for the purportedly reduced value of land on the protected side of the hurricane-protection levee. The district court ordered such damages sua sponte. The district court denied Landowners' request for prejudgment interest and reimbursement of taxes paid between the alleged actual interference with their enjoyment of the property and Landowners' receipt of compensation.

Landowners appealed the denial of prejudgment interest and reimbursement

8

for taxes paid. Landowners also appealed the district court's refusal to award severance damages for land in the hurricane-protection levee's right of way. The Government cross-appealed the district court's decision to base compensation on the value of the condemned land if suitable for development and the district court's award of severance damages for the ostensible reduction in value of the land on the protected side of the hurricane-protection levee.

## II.

We review the district court's factual findings for clear error and its legal conclusions de novo. See United States v. 50.822 Acres of Land, 950 F.2d 1165, 1168 (5th Cir. 1992). The district court's valuation methodology "must be based upon principles that reflect sound reasoning." Margate Shipping Co. v. M/V JA Oregon, 143 F.3d 976, 990 (5th Cir. 1998).

## III.

We first address our attention to the primary issue raised in the Government's cross-appeal. It is undisputed that on the date the Government condemned their land, the Landowners could no longer have prevailed in an inverse condemnation suit to recover damages resulting from the Corps' refusal to allow BDF to construct

9

a levee at its desired location. Such a suit would have been precluded by res judicata and time-barred under the Tucker Act, 28 U.S.C. § 2501. See Bayou des Familles Dev. Corp., 130 F.3d at 1040; Cristina Inv. Corp., 40 Fed. Cl. at 579-80; see also Mathis v. Laird, 457 F.2d 926, 927 (5th Cir. 1972) (holding a dismissal on statute of limitations grounds to be a decision on the merits for the purposes of res judicata). Nevertheless, the district court essentially concluded that the Government's condemnation proceeding breathed new life into the Landowners' expired inverse condemnation claims. Specifically, because one federal instrumentality (the Corps) had denied the levee construction permit, and another federal instrumentality (the National Park Service) had condemned the land, the condemnation suit provided the Landowners with a second opportunity to obtain the damages they sought in their earlier Tucker Act suits. The district court's necessary calculation of damages due in the condemnation suit would become the method by which the Landowners would get what they were otherwise no longer entitled to receive. We believe the district court erred in reaching that conclusion.

The district court relied on the scope-of-the-project rule in determining that the Government could be liable for the earlier permit denial. In United States v. 320.0 Acres of Land, 605 F.2d 762 (5th Cir. 1979), we succinctly articulated the scope-of-the-project rule:

10

> If the condemned land was probably within the scope of the governmental project for which it is being condemned at the time the Government became committed to that project, then the owner is not entitled to any increment in value occasioned by the Government's undertaking the project.

Id. at 781-82. As we made clear at the time, the scope-of-the-project rule is also applicable to "depreciations in value . . . attributable to the Government project for which property is taken." Id. at 787 n.32; see also 42 U.S.C. § 4651(3) (codifying the scope-of-the-project rule with respect to any "decrease or increase in the fair market value of real property prior to the date of valuation caused by the public improvement for which such property is acquired"). Thus, in some instances where the government initiates a project that drives down the value of neighboring lands, if the government subsequently condemns those lands, it will have to pay the landowners the lands' (higher) pre-project value. For example, suppose the government fully intends to build a five square-mile landfill in what is presently a residential neighborhood. The government initially condemns one square mile and re-zones it for landfill use. Presumably, such an action would lower the value of adjoining lands. The government could then pay less for the additional four square miles than what it would have had to pay if it had condemned the five square miles in one fell swoop. The scope-of-the-project rule dictates that the compensation due from such a piecemeal condemnation will be the same as it would have been had the

11

condemnation occurred all at once. Where it applies, the scope-of-the-project rule could theoretically allow a landowner to recover at the compensation stage of a condemnation suit what he would no longer be able to recover via a Tucker Act inverse condemnation suit.

In 320 Acres we pointed to three factors relevant in determining whether to apply the scope-of-the-project rule: (1) Whether it was foreseeable that the project would be enlarged to include the later-condemned property; (2) The length of time between the initiation of the project and the condemnation of the later-condemned property; and (3) The nature of governmental representations about the final borders of the project at the time that project was originally announced. See 320 Acres, 605 F.2d at 791-92. In applying those factors to that case, we indicated that an 18-year lapse of time between the initiation of the project and the condemnation of the land in question might be so long as to render the scope-of-the-project rule inapplicable to the later condemnations. See id. at 797. We further held that a mere government authorization to purchase land, unaccompanied by an allocation of funds for that purpose, "hardly evinces a firm commitment [to subsequent condemnations], especially when the Government has permitted certain lands within numerous other National Parks to remain privately owned." Id.

In United States v. Meadow Brook Club, 259 F.2d 41 (2d Cir. 1958), the

12

Second Circuit articulated a further consideration that is instructive in helping us determine whether the scope-of-the-project rule applies to the instant case. In Meadow Brook the United States filed a complaint seeking to condemn certain parcels in order to enlarge an airfield. The court confronted a valuation dispute over whether compensation should be based on the land in question being re-zoned for industrial use or its present (lower-value) residential use. Meadow Brook had applied for a re-zoning, but that application had been opposed successfully by the Air Force on the ground that industrial development on the land in question would create flight hazards for planes landing at the airfield. Id. at 46. The court held that absent a showing that "the government's sole motive in resisting the change in zoning was to depress the market value of the property which it then intended to condemn," it would not exclude the Air Force's opposition to the re-zoning as a factor suggesting that the land should be valued based on residential zoning. Id. at 45. Where the record contained no allegation of bad faith by the government, it was inappropriate to allow the landowners to benefit from an improbable prospective re-zoning, even if the government's action was the primary obstacle to the re-zoning.

Applying these considerations to the facts at issue here, we hold that the scope-of-the-project rule is inapplicable. As a threshold matter, we must define the "project" and its initiation date. For scope-of-the-project purposes, the relevant

13

project is the establishment of Jean Lafitte National Park. Congress created that Park in 1978. Recall that Congress did not initially authorize the National Park Service to buy Landowners' property, or any other property in the 11,400-acre park protection zone. Rather, such purchases would only be authorized if the relevant state and local government agencies failed to enact land-use regulations that would adequately protect the Park's core.

In order for the scope-of-the-project rule to apply to the instant case, the record would have to show that when the Corps denied BDF's permit application in 1979, it anticipated that the denial would drive down the price of Landowners' property and that this would facilitate the National Park Service's eventual acquisition of the land. We believe the record belies any such conclusion. To the contrary, it is clear that at the time the Corps denied the BDF's permit application, there were no concrete plans to purchase any land in the park protection zone. Those plans to acquire lands did not begin until 1986, and the Government did not file condemnation complaints against Landowners' property until 1994. Thus, there was a sixteen-year lapse between the initiation of the project in question and the acquisition of Landowners' property; the Government action that reduced the value of Landowners' property (the denial of the permit application) pre-dated any concrete plans to purchase that property; and, as in Meadow Brook, there is no

14

evidence that the Government's motive in denying the permit application was to drive down the value of Landowners' property.[1]  Rather, the record clearly indicates that the Corps' primary purpose in denying the permit was to protect the Park's ecosystem.  On these facts, compensation should be based on the value of the land at the time of the condemnation, regardless of prior Government actions that rendered the land less valuable than it might have been in the absence of prior Government activities.  It was error for the district court to value Landowners' property as if the proposed BDF levee had been completed.

At oral argument and in supplemental briefing, Landowners presented an additional theory supporting the district court's valuation determination. Landowners assert that although their inverse condemnation suits to recover compensation for the Corps' denial of the levee permit were dismissed by the Federal Circuit as time-barred, these decisions do not preclude them from recovering the same damages in the present condemnation litigation.  Landowners argue that a government condemnation action waives sovereign immunity as to all compensation issues relating to property identified in the condemnation complaint. There are several reasons why we reject Landowners' effort to re-litigate an expired

---

[1]  No remand on the bad-faith question is warranted.  If any evidence of bad faith existed, the plaintiffs had every incentive to present it at trial.

15

inverse condemnation suit "via the back door."

A fundamental reason for rejecting Landowners' novel theory is our inability to square it with any temporal limiting principle. If the federal government were to have built a dam in 1900, and this dam lowered property values for nearby landowners, the landowners would be able to recover damages for this alleged taking if the federal government decided in the year 2000 that it ought to condemn their land. Property law will not bear continuing governmental liability of that nature. The federal government and federal courts need not revisit every possible ancient inverse condemnation claim when they decide to condemn a piece of property. The animating principles behind the Tucker Act's six-year statute of limitations are consistent with venerable property rules that stress the importance of finality, clarity of title, and the extinguishment of claims by owners who sleep on their rights. See generally Hohri v. United States, 586 F. Supp. 769, 786 (D.D.C. 1984) ("The length of [the Tucker Act's] statute of limitations is a product of a legislative weighing of competing claims of fairness -- the need of plaintiffs for a reasonable amount of time within which to present their claims, and the right of defendants to be free of stale claims. Statutes of limitations also protect both the Court and the defendant from cases where the loss of evidence -- by death or disappearance of witnesses, fading memories, or disappearance of documents --

16

may frustrate the search for truth."), adopted after the Supreme Court vacated and remanded on other grounds by 847 F.2d 779 (Fed. Cir. 1988); Thomas W. Merrill, Property Rules, Liability Rules, and Adverse Possession, 79 Nw. U. L. Rev. 1122, 1128-33 (1984) (describing the necessity of adjudicating claims before evidence has been lost, the desirability of quieting titles, the interest in discouraging owners from sleeping on their rights, and third party reliance interests as the traditional justifications for transferring title to an adverse possessor after the statute of limitations has run); Carol M. Rose, Canons of Property Talk, or, Blackstone's Anxiety, 108 Yale L.J. 601, 604-12 (1998) (discussing Blackstone's consequentialist motivations for treating existing distributions of property as beyond question despite his own doubts about whether "current claimants really have any solid foundation for the things they claim"). To grant property owners an unlimited right to litigate (or re-litigate) any claims that the government previously interfered with their property rights would also run aground of the rule that a property owners' right to receive just compensation is not absolute, but depends on his compliance with the law's unambiguous procedures for obtaining such compensation. See Bay View, Inc. v. Ahtna, Inc., 105 F.3d 1281, 1285 (9th Cir. 1997) ("The simple fact is that we have no jurisdiction to address the merits of takings claims where Congress has provided a means for paying compensation for any taking that might have

17

occurred."). As the Supreme Court had noted, "taking claims against the Federal Government are premature until the property owner has availed itself of the process provided by the Tucker Act." Williamson County Regional Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 195 (1985). After the property owner has availed itself of that process and been denied compensation, further litigation must allege that the process for receiving compensation, the Tucker Act in this case, is not a "reasonable, certain and adequate provision" for obtaining compensation or that the adequate procedures were not followed. See City of Monterey v. Del Monte Dunes, 526 U.S. 687, 710 (1999); Williamson County, 473 U.S. at 194. Quite sensibly, Landowners do not argue that the Tucker Act is a constitutionally inadequate means for obtaining compensation. The Federal Circuit's dismissals of Landowners' Tucker Act claims are therefore res judicata.

Second, Landowners' argument that the federal government waives sovereign immunity as to all possible inverse condemnation counterclaims involving the same land when it files a condemnation suit is inconsistent with the Supreme Court's clearly-articulated decisions holding that waivers of sovereign immunity must be narrowly construed. See, e.g., Department of the Army v. Blue Fox, Inc., 525 U.S. 255, 261 (1999) ("We have frequently held, however, that a waiver of sovereign immunity is to be strictly construed, in terms of its scope, in favor of the sovereign.

18

Such a waiver must also be 'unequivocally expressed in the statutory text.'") (citations omitted); see also Narramore v. United States, 960 F.2d 1048, 1051 (Fed. Cir. 1992) ("The condemnation statutes do not waive sovereign immunity for property owners to institute counterclaims or suits seeking damages for takings beyond the scope of the Government's filing."). Landowners do not point us to any text in the federal condemnation statutes or rules that permit a landowner to recover compensation for prior regulatory takings that reduced the value of the property in question. The Government's sovereign immunity therefore defeats a claim alleging that Landowners' compensation in condemnation should be adjusted upward to reflect what the land would have been worth in the absence of a prior regulatory taking.

Confronting an analogous set of circumstances, the Ninth Circuit reached a result consistent with the one we reach today. In United States v. 422,978 Square Feet of Land, 445 F.2d 1180 (9th Cir. 1971), the court considered a case in which the federal government took physical possession of submerged lands owned by California in 1940. In 1955, the federal government filed a condemnation suit to obtain title to the land already in its possession. The government then sought dismissal of its condemnation complaint with prejudice to the state's ability to recover compensation in light of California's failure to sue within the Tucker Act's

19

six-year statute of limitations.  California argued that, notwithstanding the statute of limitations, it was still entitled to receive compensation for the value of the submerged land in light of the federal government's condemnation suit.  The Ninth Circuit rejected this argument, holding "that the running of the Tucker Act period of limitations precluded the State from recovering in the condemnation proceedings."  Id. at 1188.  Thus, where a landowner could have successfully sought compensation under the Tucker Act but failed to do so, the initiation of government condemnation proceedings to acquire that same land did not create a second opportunity to recover compensation for the government's prior inverse condemnation via the compensation-determination process.

In arguing to the contrary, Landowners rely heavily on a footnote in a recent decision by a judge on the Court of Federal Claims.  Construing Narramore, that court wrote :

> The statement in Narramore v. United States, 960 F.2d 1048, 1050
> (Fed. Cir. 1992) that condemnation statutes do not waive the
> government's immunity from property owners' "counterclaims" clearly
> does not prohibit a defendant from alleging an earlier date of taking or
> a greater compensation amount than deposited with the court at the
> time of the declaration.

Stephenson v. United States, 33 Fed. Cl. 63, 75 n.21 (1994).  Whatever the merits of this footnote, the Stephenson decision certainly does not contemplate the

20

situation at hand, where Landowners have already had their separate inverse condemnation suits dismissed as time-barred. See id. at 81 ("Indeed, the federal courts of appeals uniformly have held that a district court lacks jurisdiction to entertain a true counterclaim in a condemnation proceeding, that is, a separate freestanding claim that otherwise could be asserted independently in another proceeding [in the Court of Federal Claims]."). Landowners provide us with no reason why the Court of Federal Claims could not have considered their Tucker Act claims had they been timely filed.

Landowners also cite Georgia-Pacific Corp. v. United States, 568 F.2d 1316 (Ct. Cl. 1978), where the Court of Claims confronted "what should be done when a claimant brings suit in this court for an inverse condemnation of land interests, and not long thereafter the Government files a District Court condemnation action involving the very same interests but asserting a later taking-date." Id. at 1318. The court held that the district court had the authority to determine which of the two parties' proposed date of taking was correct and to value the property as of that date. See id. at 1319. The court also suspended any further Tucker Act proceedings pending the district court's determination of the taking date.[2] In

---

[2] As the Georgia-Pacific court made clear, the Court of Claims was not transferring the litigation to the district court, only suspending "further proceedings

21

Georgia-Pacific, unlike in the instant case, the property owners' inverse condemnation suit would have been timely under the Tucker Act. Thus, in making a determination as to which of two competent courts should adjudicate a common question at issue in two separate lawsuits, the court deferred to the district court. Absent the viability of both the inverse condemnation and condemnation suits, we do not read the Georgia-Pacific decision as allowing a district court to consider the equivalent of a time-barred and jurisdictionally barred Tucker Act counterclaim. The court implied as much in its extended discussion of the unusual procedural posture of that dispute:

> The condemnation proceeding covers several parties in addition to Georgia-Pacific. We thus have only part of the eminent domain litigation in this court. . . . The nub of it is that only the District Court is in a position to decide all phases of the litigation in the event Georgia-Pacific's claim of an early taking should be rejected.
> Moreover, a single tribunal is better able than two or more independent courts to direct and handle variant and alternative claims all bearing on the same situation. Sometimes such unified treatment is precluded by jurisdictional statutes, but where it is not – as we think is

in this litigation until the District Court had decided when the date of taking occurred, or has refused to inquire whether a time prior to March 5, 1976, is the correct one." 568 F.2d at 1319. After the district court made its determination with respect to the common issue in the two suits, the inverse condemnation aspects of the suit would have been adjudicated by the Court of Claims alone. In the case at bar, the Court of Federal Claims is similarly the only court with jurisdiction to consider the inverse condemnation claim, but res judicata and the Tucker Act's statute of limitations now deprive it of the authority to do so.

22

> true of this instance – it is ordinarily better to centralize the proceedings in the tribunal which has the widest scope to handle all the parts of what is in commonsense one unified piece of litigation.

Id. at 1321. These considerations simply are not implicated where one tribunal has already dismissed a claim as time-barred and the district court confronts an effort to resuscitate a claim arising out of the very same governmental action. The judicial efficiency considerations that warranted a stay of Court of Claims proceedings pending a district court determination in Georgia-Pacific here warrant a district court's refusal to revisit the facts underlying Landowners' already adjudicated inverse condemnation claims.

In light of Landowners' failure to pursue their Tucker Act remedies in a timely manner, they may not argue in the condemnation proceedings that they should be compensated based on the value of their property as if suitable for residential development.[3] On remand, the district court should determine the value of Landowners' property in its current, unsuitable for development, state.

---

[3] For the same reasons, we affirm the district court's determinations that Landowners are entitled to neither reimbursement of taxes paid on the properties since the date of the alleged inverse condemnation nor prejudgment interest. Landowners' proper remedy for recovering such damages were Tucker Act inverse condemnation suits. Because such suits have already been dismissed as untimely by the Federal Circuit, res judicata and a lack of jurisdiction bar us from revisiting those claims for damages.

IV.

The Government also argues that the district court erred by awarding severance damages to Landowners Cris Realms and Cristina Investment for damage to property on the protected side of the hurricane-protection levee. We agree.

Although Landowners did not request such severance damages below, the district court awarded damages to compensate them for the partition of their land that occurred as a result of the construction of the hurricane-protection levee. The hurricane-protection levee ran through Landowners' property, presumably making it more difficult to travel from one side of the property to the other. The district court apparently concluded that but for the Corps' denial of the BDF levee permit application, the hurricane-protection levee would not have been built, so Landowners' property would not have been partitioned.

Any severance damages resulting from the construction of the levee are not compensable in the present proceedings because they were not caused by the Government's condemnation of the properties in the instant suit. Landowners' opportunity to acquire severance damages as a result of the hurricane levee came and went in the state court condemnation litigation that culminated in West Jefferson Levee Dist. v. Bayou des Familles Dev. Corp., 640 So.2d 1258, 1284 (La. 1994). It was, after all, the state government, not the federal government, that built the

24

hurricane-protection levee. Landowners' argument that severance damages are due because the Corps' refusal to permit the BDF levee resulted in the hurricane-protection levee's placement is unpersuasive for the reasons stated above.

V.

Landowners also appeal one of the district court's rulings with respect to severance damages. The district court denied Landowners' request for severance damages to lands underneath the hurricane levee. Although that land has been condemned by the State of Louisiana, and Landowners received payment from Louisiana for those lands, Landowners sought severance damages for value allegedly taken by the United States prior to Louisiana's expropriation. The district court held that because "the land underlying the levee had been expropriated by the West Jefferson Levee District before the condemnation proceedings herein, landowners are not entitled to severance damages on that portion." This reasoning was sound. See United States v. Dow, 357 U.S. 17, 20-21 (1958) (holding that only the owner on the date of the taking is entitled to receive just compensation.). For the aforementioned reasons, Landowners can only recover severance damages resulting from the condemnation itself, not from any prior Government action. Thus, if the condemnation caused any severance damages to the land underneath the

25

levee, the State of Louisiana, which owned that land at the time of the condemnation, would be the proper recovering party.

VI.

For the foregoing reasons, we AFFIRM in part, REVERSE in part, and remand for a recalculation of just compensation consistent with this opinion.