[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-13584

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 11, 2009
THOMAS K. KAHN
CLERK

D. C. Docket Nos. 96-01249-CV-WJZ,
00-02914-CV-WJZ

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

480.00 ACRES OF LAND,
More or Less, in the County of
Dade, State of Florida, et al.,

Defendants,

GILBERT R. FORNATORA,
FRANK PLATTNER, et al.,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____
(February 11, 2009)

Before BIRCH and MARCUS, Circuit Judges, and FORRESTER,[*] District Judge.

FORRESTER, District Judge:

Appellants appeal the district court's order confirming and approving a September 15, 2005 Land Commission Report setting the compensation that the United States must pay Appellants to take their property by eminent domain. Appellants contend that (1) the district court adopted the wrong legal standard to determine whether the Government improperly used a local zoning ordinance to prevent development on and reduce the value of their land; (2) the district court improperly excluded evidence of the Government's efforts to depress their land values from being presented to the Land Commission; and (3) the procedures employed by the Land Commission and the United States in determining their "just compensation" denied them due process of law.

For the reasons set forth below, we AFFIRM the district court's order awarding compensation and hold that (1) in order for a fact finding body to ignore

_____

[*]Honorable J. Owen Forrester, Senior United States District Judge for the Northern District of Georgia, sitting by designation.

2

a regulation in calculating "just compensation" for a given piece of property, the landowner must show that the primary purpose of the regulation was to depress the property value of land or that the ordinance was enacted with the specific intent of depressing property value for the purpose of later condemnation; (2) once the district court determines that a regulation or ordinance was not improperly used to prevent development and reduce value, there is no reason to present evidence of such allegations of improper use to a Commission charged with determining "just compensation";  and (3) no actual bias was present in the Commission report filed on September 15, 2005, and the individual landowners' rights were preserved.

## I.     Background

The instant appeal involves seven regulated, vacant, and unimproved tracts of wetlands in Dade County, Florida suitable for passive recreational use. The Appellants acquired the tracts in the 1950s and 1960s.

### A.     *The History of Regulation on These Properties*

In 1971 South Florida experienced a water crisis, and the citizens of Dade County ("the County") became increasingly concerned about development in the Everglades and its impact upon the County's demand for water.  Therefore, in 1975 the County designated a large area of land, including Appellants' acreage, as

3

an "Area of Critical Environmental Concern" and developed a Comprehensive Development Master Plan which restricted development to one dwelling per five acres. During this time, the National Park Service also became concerned about development in the area east of the Everglades National Park. This property contained watershed area that the Park Service believed, from an ecological perspective, should have been included in the original park boundaries.

The Park Service suggested that the County revisit its Comprehensive Development Master Plan for the area. A federally initiated and funded study process known as the East Everglades Resource Planning Project (EERP) began. EERP sought to recommend a management plan to Dade County. Dade County sought to use the EERP to address its local water supply and control concerns. Although the EERP studies concluded that the existing one-dwelling-per-five-acre density under the 1975 Plan adequately addressed the County's water concerns, the EERP recommended one dwelling per forty acres with no agriculture allowed. The County adopted the more stringent one-per-forty standard when it passed the 1981 East Everglades Zoning Overlay, later added to Chapter 33B of the County Code.

## B. Condemnation

In 1989, Congress authorized the expansion of the boundaries of Everglades National Park to include most of the area known as the East Everglades and the Appellants' acreage. 16 U.S.C. §§ 410r-5, *et seq.* Congress did not provide any funding for the private land acquisition necessary for expansion until 1992, and the expansion was not fully funded until 1999. Armed with sufficient funding, the U.S. Department of the Interior filed 2,700 condemnation cases in the U.S. District Court for the Southern District of Florida beginning in 2000. Given the large amount of land and the large number of land owners involved, the district court appointed a land commission ("the Commission") pursuant to Fed. R. Civ. P. 71.1(h) to determine the just compensation due to each landowner as part of the East Everglades Acquisition Project.

The district court issued instructions to the commissioners, and the parties were given the opportunity to object. (R-5). These instructions outlined the relevant rules of law and procedure necessary for the Commission to make a determination of fair compensation as a fact finding body similar to a jury.

Instructions 5, 16, 19, and 21 are particularly relevant to this case. The last portion of Instruction 5 states, "It is proper to look to state law to determine the existence of land use or other restrictions on the uses to which the property may be

devoted, because any such restrictions on the lawful uses of the property limit the uses available for consideration as highest and best use." (*Id.* ¶ 5). Instruction 16 addressing "Highest and Best Use," states in part:

> Any proposed highest and best use must be a legally permissible use. Where the use of the property is restricted by the requirement of a permit or license or by any other land use restriction it must be shown that there is a reasonable probability that such permit or license will be issued or that a re-zoning will occur to make the use legal.

(*Id.* ¶ 16). Paragraph 19 is entitled, "Reasonable Probability," and it reiterates that legal restrictions on the use of the property must be considered in determining its highest and best use. "If, at the time of the taking, the property was subject to zoning restrictions, license regulations, or other land use restrictions those factors must be considered in evaluating the property . . . ." (*Id.* ¶ 19). Paragraph 21 entitled, "Value to the Government" states:

> You are not to consider the value of the property to the Government, nor may you consider when valuing the property before the taking, any increase or increment of value by virtue of the activities of the Government with reference to the project for which the property is being acquired.

(*Id.* ¶ 21).

In the fall of 2000, several landowners filed objections to the district court's instructions. (R-6). Appellants objected generally to the Commission being

6

allowed to consider current zoning restrictions on the use of their properties resulting from the Counties' 1981 East Everglades Zoning Overlay. Appellants contended that the United States Department of Interior improperly influenced the County to pass the Overlay in order to make its subsequent condemnation of the East Everglades easier and less costly. Specifically, Appellants objected to Instructions 19 and 21.[1]

In its Order addressing the objections, the district court agreed with Appellants that "the government 'may not misuse its zoning powers to reduce the expense of a subsequent condemnation.'" (R-6, at 9). The district court considered two issues: "(1) What is the necessary proof that the purpose of the restriction was a 'tool' to depress the value of the land? and (2) Whether the rule applies when the governmental body that imposed the restriction differs from the one that condemns the property?" As to question one, she found that some courts require that the "sole purpose" of the regulation be to depress property values; *see United States v. Meadow Brook Club*, 259 F.2d 41, 45 (2d Cir. 1958); other courts require that the "primary purpose" or "real purpose" be to depress property values to minimize the cost of acquisition; *see Dep't Public Works and Buildings v.*

---

[1]Appellants also objected to Instructions 5, 15, 16, 22, and 26, but these objections need not be addressed in this appeal.

*Exchange National Bank*, 334 N.E. 2d. 810, 819 (Ill. App. 1975); while a third set

of courts requires only that the governmental body "intentionally" or

"deliberately" manipulate zoning to depress the value of the property being

condemned; *see City of Bellevue v. Kravik*, 850 P.2d 559, 562 (Wash. App. 1993).

From these cases, she articulated the following standard: "the landowner must

show that the primary purpose of the regulation was to depress the property value

or that the ordinance was enacted with the specific intent of depressing the

property values for the purpose of condemnation." (R-6, at 11). With respect to

the second inquiry, she examined the holdings in *California v. Southern Pacific*

*Transportation Co.*, 109 Cal. Rptr. 525 (Cal. App. 1973), and *Assateague Island*

*Condemnation Opinion No. 3*, 324 F. Supp. 1170 (D. Md. 1971), and stated:

> The Land Commissioners may disregard zoning restrictions
> improperly imposed by the State of Florida or Dade County only if
> there is evidence that the United States either directly or indirectly
> depressed property values. If the State of Florida or Dade County
> previously imposed a zoning restriction on the land at issue
> independently of -- i.e., "neither taken in concert nor by agreement
> with" -- the United States, even if such restriction was imposed
> explicitly and uncontrovertedly to aid the State or County to condemn
> the property at depressed value, the zoning restriction must be
> considered in accordance with the other instructions.

(*Id.*, at 15). She stated that the court was aware of no evidence in the record that

would meet either the intent or primary purpose standard and held "unless and

until evidence is presented that this will be an issue at trial, there is no need to modify [Instruction 19]. If this becomes an issue at trial, the court will amend the instructions." (*Id.*). She agreed to modify Instruction 21.[2]

### C. Two Years of Pretrial Proceedings in Magistrate Court

Appellants' seven properties were consolidated for trial and a trial was set for December 2001. (R-7, R-8).[3] Numerous pretrial proceedings pushed the trial date back from December 2001. In September 2001, Appellants again moved to amend the instructions related to Instruction 19 and for an evidentiary hearing on his motion. (R-9). The Government opposed the motion and argued for a motion in limine ruling that the 1981 Zoning Overlay should be considered in the proceeding and barring re-litigation of the matter. The district court temporarily denied Fornatora's motion and instructed the parties to submit all evidence and to brief (1) whether the zoning regulation was enacted with the primary purpose or

---

[2]Instruction 21 then read: "Scope of Project: You are not to consider the value of the property to the Government nor may you consider when valuing the property before the taking, any increase or decrease in value by virtue of activities of the Government with reference to the project for which the property is acquired.

[3]It is important to note the numerous judicial changes throughout the course of this case. It appears that Judge Lenore Nesbitt had the case through most of its early stages, although Judge K.M. Moore signed numerous orders as well. The case was transferred to Judge William Zloch in October 2001. Judge Zloch referred the case to Magistrate Judge Andrea Simonton in November 2001. The case appears to have been taken out of Judge Simonton's hands in January 2003 and assigned to Magistrate Judge Robert Dube; he and Judge Zloch had the case until the appeal.

specifically intended to depress the value of property for later condemnation; and (2) whether the Government acted in concert or agreement with the agency that actually imposed the zoning ordinance depressing property values in anticipation of condemnation, so that the court could determine whether an evidentiary hearing was needed. (*Id*.). Magistrate Judge Moore issued an order explaining the mechanics of presenting these issues and in doing so stated:

> Whether to provide the instruction [on the federal government's influence over county zoning ordinance] and the language of the instruction is a matter for the Court to decide; what impact that this evidence has on the amount of just compensation is a matter for the Commissioners to decide. If either party believes that there is insufficient evidence on the improper zoning issue to preclude presentation to the Commissioners, then that party should file the appropriate motion to exclude certain evidence . . . [and] have the Court render a decision as a matter of law on this issue.

(R-15, at 5). Pretrial disputes on these issues lasted for more than two years before the Magistrate Judge.

On August 4, 2004, the Magistrate Judge issued a Report and Recommendation addressing "whether the Land Commission should be instructed that the zoning restrictions (the 1981 East Everglades Zoning Overlay and related ordinances) imposed by Miami-Dade County . . . should be disregarded in determining the value of the subject parcels based on the application of the 'scope of the project' doctrine." (R-14). The court extensively reviewed information

10

surrounding the passage of the 1981 Zoning Ordinance, going back to the early 1970s. The Government introduced a 1978 resolution adopted by the Dade County Board of Commissioners entitled, "Resolution Approving the Plan of Study for the East Everglades Land/Water Resources Management Plan; and Authorizing County Manager to Apply for and Enter into a Federal Grant and Seek State and Water Management District Funding to Assist in the Preparation of said Plan," the 1975 Comprehensive Plan designating a major portion of the East Everglades as an "Area of Critical Environmental Concern pursuant to Chapter 33B, Code of Metropolitan Dade County," the Proposed Management Plan, and the 1981 Overlay Ordinance itself. Appellants were allowed to present the following evidence which they contended supported the Government's involvement in the passing of the Overlay.

(1)    A March 1974 Letter from the Asst. Secretary of the Interior to the Attorney General of Florida and the Dade County Manager which discusses concerns about future development and stated:

We are concerned about the extensive future development of the Taylor Slough area and all the drainage areas to the eastern portion of Everglades National Park, which the construction of this road portends. We assume you share our concern in this respect. However, rather than allowing such extensive future development to occur and create a danger to Park resources, which would necessitate numerous and piecemeal legal confrontations, a preferable solution to

11

these problems is a cooperative Federal-State effort to take the initiative by asserting the legal authorities at our disposal and controlling development in these areas prior to the necessity for litigation. Such a solution would most effectively protect all the interests concerned, i.e., the Everglades, the State's downstream resources, and the affected landowners.

(2)     A June 1974 letter from the Superintendent of Everglades National Park to the Dade County Mayor and Commission urging the preservation of the East Everglades through an extension of the moratorium and an adoption of proper land use regulations and encouraging "strong, joint, County, State and Federal action."

(3)     Federally funded studies in the mid-1970s and statements made by a Department of Interior official in 1976. The official talks about the possibility of taking lands in the East Everglades, the expense of doing so, and other possible solutions involving state and county governments. These federal studies recognize that Dade County might allow more intensive uses of the East Everglades than would be acceptable for Park management purposes and suggest, "the Department of the Interior must be prepared to take additional actions, up to and including purchase in order to protect [its] interest."

12

(4)     Documents suggesting that the one-dwelling-per-forty-acres restriction was not based on the County's research but was a restriction recommended by the Government as the maximum restriction allowed to avoid a regulatory taking.

(5)     Documents indicating a long history of the federal officials providing comments on projects proposed for adjacent or related lands and noting the Government's participation in the East Everglades Resources Planning Project.

(*Id.*, at 12-18).

The Magistrate Judge found:

In the present case, the evidence presented to this Court, as extensively set out above, fails to show that the primary purpose of the Zoning Overlay Ordinance was to depress the property values of the subject parcels or that it was enacted with the specific intent of depressing property values for condemnation purposes. The evidence instead shows that the purpose and intent of the regulations was for the ecological reasons set out in the Ordinance itself. The evidence presented by the Defendants completely fails to satisfy the requirements imposed by [the original Judge district court order] that the movant show that reducing property value was the intent and purpose of the Ordinance. Thus, no relief on this basis is warranted.

Additionally, even if the evidence could somehow be seen to allow for the determination that the purpose and intent had been shown, there is clearly insufficient evidence to show that the United States acted in concert or agreement to depress the property values. All the evidence presented to this Court shows is that the federal government

13

shared the concerns expressed by the state and local governments in ensuring the continued vitality of the natural resources of South Florida.

(R-14, at 25). The Report and Recommendation recommended that Appellants' Instruction 19 motion be denied and the Government's motion in limine be granted and that all related motions be denied with prejudice. Appellants objected to the Report and Recommendation, but on November 8, 2004, the district court conducted a *de novo* review and adopted it. (R-15).

### D. *The Trial and Commission Report*

The parties proceeded to trial on August 16-18, 2005, before the Rule 71 Land Commission to determine just compensation for Appellants' seven tracts. Appellants contended that the value of their six small tracts was $1,500 and the value of their large tract was $2,000 per acre, while the Government contended that the values were $500 and $850 per acre, respectively. Appellants presented two witnesses along with their own testimony. A certified appraiser testified as to the fair market value of the seven parcels, while a planner and land use expert provided testimony on permissible uses of the land of the subject properties and the properties the appraiser used as comparables. The Government presented the testimony of another certified appraiser; the owner of Alligator Farms, Inc., and the purchaser of a number of the Government appraiser's comparables; a

14

hydrologist with the Everglades National Park; and an employee of the South Florida Water Management District. The appraisers agreed that the highest and best use for the seven tracts was passive recreational use and that the comparable sales approach was the best method to determine value. The two experts differed in their comparables.

Appellants' appraiser used sixteen comparables, ranging in value from $1,196 to $3,000 an acre. Two of the sixteen comparables were within the relevant land areas, while the other fourteen were outside the relevant land areas twenty or more miles south in areas that, while environmentally sensitive, were not as limited by zoning restrictions. Seven of the comparables involved sales to the Everglades Alligator Farm. The owner testified that he only paid the price he paid for these parcels because they were within the vicinity of his business and necessary to secure air boat trails for his tourist attractions. Three of the comparables had the potential for agricultural use and one of his comparables had value as a mining property. Appellants' property was suitable for neither mining nor agriculture.

The Government's appraiser used seven comparables ranging in value from $200 to $2,083 an acre. Only two of his comparables were sold within the past fifteen years, and those properties were distress sales which offered little insight.

One of his other comparables was a bank foreclosure. The Government appraiser's $2,083 per acre property was in a less restrictive area, had road access, and had a structure built upon it. The Government appraiser also included comparable #6, a 1982 sale of eighty acres for $500 per acre, and comparable #1, a 1986 sale of 137 acres for $700 per acre. Appellants offered a 1987 comparable for $1,050 on cross-examination of the Government's expert to challenge his 1986 comparable. Appellants did not offer this comparable in their case in chief because they believed it to be too old.

The Commission issued its report on September 15, 2005. (R-16). The land commission determined Appellants had not established that their properties should be valued at $1,500 and $2,000 an acre, respectively, but they had established that their value was more than the $500 and $800 an acre values the Government put forth. The Commission assessed all twenty-three comparables presented by the appraisers in their direct testimony. The Commission found that while properties discussed by Appellants' appraiser provided insight into the value of Appellants' land, none of properties were actually comparable. The Commission found that only comparable #1, the 1982 sale for $500 an acre, and comparable #6, the 1986 sale for $700 an acre, offered by the Government were actually analogous to Appellants' properties. The Commission did not address the 1987 comparable.

16

The Commission set just compensation for Appellants' six smaller properties at $700 per acre and the proper value for the seventh and largest property at $900 per acre. The total value of Appellants' acreage was $472,000.. In accordance with the district court's pretrial ruling, the Commission did not hear any of the Appellants' evidence regarding the Government's involvement in the 1981 Overlay or the value of the lands without the Overlay restrictions.

E. *Proceedings Following the Commission's Report*

Relevant to this appeal, Appellants raised three objections to the Commission's report and claimed that these objections constituted independent grounds for the district court to conduct a *de novo* trial on the issue of just compensation or remand the report for a new trial before a newly-appointed commission. First, they contended that the district court had used the wrong standard to determine whether the Government had acted to depress land value. Second, they contended that the district court should have amended the instructions to the Commissioners relating to the 1981 East Everglades Zoning Overlay. The court found that these two objections regarding the 1981 Zoning Overlay had already been addressed and rejected in an earlier Report and Recommendation. Lastly, Appellants argued that the trial proceeding before the Land Commission violated Due Process.

17

According to the Appellants, the Government had been scheduling trial groups "in which either no landowners or landowner attorneys appeared or in which landowners appeared *pro se*, without assistance of counsel and without producing expert valuation testimony." Appellants argued:

> By voluntarily dismissing parcels for which an attorney filed a notice of appearance in the early trial groups, the government achieved for itself the practical equivalent of ex parte hearings. The [Government] could present its appraisers without cross-examination or without competing expert testimony. It could advise the Commission on points of law with no opposing legal argument or input from the Court.

(R-17, at 9). Appellants ultimately concluded that by the time their case went to trial, a clear patten of compensation rulings had emerged and the Commission had their minds entirely made up. First, Appellants noted that the Commission consistently valued isolated tracts in Management Area 2A of the Everglades at $500 per acre in adherence with the Government expert's opinion, but the Commission would bump the value up to $700 for no apparent reason when a landowner appeared *pro se*. Second, the Commission did not give any weight to the 1987 comparable sale for $1,050 per acre highlighted by the Appellants during the cross-examination of the Government's appraiser, direct of Appellants' appraiser, and Appellants' closing, despite the fact that the 1987 sale was in the vicinity of the 1986 comparable on which the Commission relied and was a year

18

closer to the date of valuation. Appellants differentiated their case from *United States v. 5.00 Acres*, 673 F.2d 1244, 1247 (11th Cir. 1982), which rejected an argument that a Commission was biased because it had heard thirty-nine uncontested cases. Appellants instead compared their case to *Gwathmey v. United States*, 215 F.2d 148 (5th Cir. 1954) (reversed and remanded for a new trial due to owners being denied due process after Government condemned 236 tracts and presented all evidence before one jury).

The Magistrate Judge issued a Report and Recommendation recommending Appellants' objections be rejected. (R-17). The Magistrate Judge found that (1) *Gwathmey* was distinguishable and did not control the matter, and (2) "the Commission examined the comparables presented, including the [comparable referenced by Appellants] and noted in detail their reasoning for accepting and rejecting each comparable. The Commission's refusal to consider Appellant's appraiser comparables was reasonable, and the [Appellants] have failed to show any basis for rejecting the Report of the Commission on grounds of bias or depravation of due process." Appellants moved vacate the Magistrate Judge's Report and Recommendation. The district court vacated the Report and Recommendation, reviewed the matter *de novo*, rejected Appellants' arguments,

19

and then adopted the Commission's findings on compensation. Appellants appealed to this court. (R-18).

## II.  Discussion

The beginning of the inquiry in any condemnation matter is the Fifth Amendment which states that "[n]o person . . . shall be deprived of . . . property without due process of law; nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. In addition to the considerable due process jurisprudence, courts have developed a number of legal working rules to determine when compensation is "just." First, the measure of compensation is generally the value of the property at the date of taking. *United States v. 320 Acres*, 605 F.2d 762, 781 (5th Cir. 1979).[4] The value of a property is generally its "market value" or the price that a reasonable and willing buyer would pay a reasonable and willing seller given market conditions. *Id.* Just compensation is not limited to the value of the property as it is presently used but also includes any additional market value it may command because of the prospects for developing it to the "highest and best use" for which it is suitable. *Id.* In determining a property's "highest and best" use, a court may consider

---

[4]In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions rendered by the former Fifth Circuit prior to October 1, 1981.

existing zoning restrictions; if a zoning restriction precludes a certain use, the court will generally not consider that use in its evaluation. *Id.* (quoting *United States v. Meadow Brook Club*, 259 F.2d 41, 45 (2d Cir.), *cert denied*, 358 U.S. 921 (1958)). In determining what a hypothetical willing buyer would give for property, courts often look to actual, comparable sales on the open market between other willing buyers and sellers. *Id.* at 781 n.23. "Generally, the more comparable a sale is, the more probative it will be of the fair market value of the condemned property." *Id.* at 798. "Sound and just trial practice is to admit as many of the 'most comparable' sales available as is necessary to fairly permit each side to present its argument of fair market value for the jury's consideration." *Id.*

In some cases strict adherence to market value and comparable sales will result in manifest injustice to the owner or to the public, and courts must apply special rules and standards to arrive at "just" compensation. One such rule is the "scope of the project" doctrine. This doctrine seeks to ensure that when deciding the market value of the property the fact-finding body does not consider the positive or the negative impact of any decision the Government makes within the scope of the project which prompted the taking. As a part of this doctrine, a fact finder may disregard the impact of a zoning restriction on a piece of property in determining just compensation when the Government passed the restriction for the

21

purpose of depressing the property's value in an impending eminent domain proceeding. *United States v. 320 Acres*, 605 F.2d at 820 n.131 (citing *Metropolitan Area Transit Authority v. One Parcel of Land*, 413 F. Supp. 102, 106 (D. Md. 1976), *aff'd,* 548 F.2d 1130 (4th Cir. 1977)).

The instant matter requires us to address the appropriate legal standard in this circuit for determining when the Government has passed a restriction for the purpose of depressing a property's value in an impending eminent domain proceeding and when a court should give an instruction to the fact finder regarding such restrictions, as well as the appropriate process to be given land owners during a condemnation proceeding.

A. *The Correct Legal Standard to Determine When a Zoning Restriction or Regulation Should Be Ignored Because the Government Acted to Depress Property Value in Anticipation of Condemnation*

The Eleventh Circuit has never addressed the appropriate standard for determining whether the Government has implemented a restriction in order to depress value preceding a taking by eminent domain. We must decide whether to affirm the district court and adopt the "primary purpose" or "intent" standard supported in part by the Second, Third, and Fifth Circuits, *see United States v. Land*, 213 F.3d 830 (5th Cir. 2000)*; United States v. 27.93 Acres of Land,* 924 F.2d 506 (3d Cir. 1991); *United States v. Meadow Brook Club*, 259 F.2d 41 (2d

22

Cir. 1958), adopt the broader "nexus" standard advocated by Appellants, or adopt a unique standard. This issue is a matter of law which we review *de novo*. *Southern Natural Gas v. Land, Cullman County*, 197 F.3d 1368, 1372 (11th Cir. 1999).

The district court's standard consists of two parts – (1) "a landowner must show that the primary purpose of the regulation was to depress the property value or that the ordinance was enacted with the specific intent of depressing property values for the purpose of condemnation," and (2) the landowner must show that the government body imposing the regulation is either the same government body involved in the condemnation or has acted "in concert [or] agreement with" that entity (R-6 at 11, 14). Appellants dispute the intent or primary purpose requirement.

An analysis of the primary purpose or intent standard begins with *Meadow Brook*. 259 F.2d 41. There, a landowner sought to have the Town Board re-zone its property from residential to industrial. *Id.* at 44. Despite the fact that the area surrounding the property had become largely industrial, the Air Force, as an adjoining landowner, objected to the re-zoning. *Id.* Shortly thereafter, the Government moved to condemn the landowner's property to expand the Air Force base. *Id.* at 43. The landowner contended that the Air Force had acted in bad faith

23

in opposing re-zoning in order to lower the value of the property prior to condemnation, and absent the Air Force's intervention rezoning would have occurred. *Id.* at 45. The court rejected the landowner's argument applying a "motive test." The Second Circuit stated:

> Clearly, the United States, like any adjoining landowner, was a proper party to resist re-zoning . . . . If the air force had a proper motive, this well might have precluded re-zoning at any time [and therefore an increase in the property's value] . . . . But it is also clear that if the government's sole motive in resisting the change in zoning was to depress the market value of the property which it then intended to condemn, the court's estimate of the probability of re-zoning (as a factor entering into the ultimate calculation of value) should not have reflected this opposition.

*Id.* The Second Circuit found that there was not sufficient evidence in the record to support Meadow Brook's charge of bad faith and affirmed the district court's decision to consider the existing zoning of the property and the unlikelihood that it would change in determining the property's market value. *Id.* at 46.

The Fifth Circuit recently adopted *Meadow Brook's* standard in *Land*. 213 F.3d 830. There, the Fifth Circuit decided that the Army Corps of Engineers' 1979 decision to deny a development corporation's construction permit to build a levee was not within the scope of the National Park System's ultimate acquisition and condemnation of land for Jean Lafitte National Park. *Id.* at. 835-36. Congress created the park in 1978; its plans to acquire land begin in 1986; and the

24

Government did not file condemnation complaints until 1994. *Id.* The court found that there was no evidence that the Corps' motive in denying the land developer's permit application was to drive down the value of the property, and instead the record indicated that the Corps' primary purpose was to protect the Jean Lafitte National Park's ecosystem. *Id.* at 836. As such, the court found that compensation for the levee land should be based on its value at the time of condemnation rather than the value it might have had if the Corps had granted the 1975 construction permit. *Id.*

The Third Circuit adopted *Meadow Brook* in *27.93 Acres*. 924 F.2d 506. There, the Government contacted landowners to acquire their property, zoned agricultural, for the Appalachian National Scenic Trial. *Id.* at 508-11. The parties could not reach a settlement and the Government ultimately filed a condemnation proceeding. *Id.* Prior to the condemnation proceeding, the Township in which the land was located began contemplating an enterprise district which would require that the landowner's property be re-zoned as commercial. *Id.* While in discovery with the Government, the landowners filed an application to have their property re-zoned with the Township planning board and it was tentatively approved. *Id.* The Government agreed to postpone trial and take discovery on the commercial value of the property. Prior to the close of discovery, the Planning Commission

25

recommended to the Township that the landowners' petition be denied, offering four reasons. *Id.* The landowners later learned that the Government had sent a letter to the Township Board stating that it opposed the re-zoning request. *Id.* The board ultimately denied their petition. *Id.* At trial, the district court did not allow the landowners to present evidence of the commercial value of the property. *Id.* The landowners appealed to the Third Circuit arguing that the district court's discovery rulings preventing them from offering evidence at trial on the Government's motives in opposing re-zoning and the commercial value of the land were improper under *Meadow Brook*. *Id.* at 511.

The Third Circuit reviewed for abuse of discretion and affirmed the trial court finding that despite the fact that the landowners had deposed the author of the letter to the Board and taken other discovery, they offered no more than conclusory allegations regarding motive. *Id.* The court found that the landowners had not shown by a preponderance of the evidence that the Government's actions were the "but for" cause of the Board's removal of the condemned tract from the enterprise district and the decision not to re-zone, and thus the district court acted appropriately in not submitting to the jury the question of whether the condemned tract would likely be re-zoned commercial. *Id.* at 814.

Appellants urge us to ignore the intent or motive holdings of our sister circuits and instead to adopt a standard under which a landowner must only show a "nexus" between the Government's project-related activities and the local zoning which caused depreciation in value. Appellants draw this standard from *United States v. Truro*, 476 F. Supp. 1031 (D. Mass. 1979), and *Assateague Island Condemnation Opinion No. 3*, 324 F. Supp. 1170 (D. Md. 1971). In *Truro*, "Congress motivated, and, as a practical matter, pressured" six towns to enact zoning provisions which Congress wanted to preserve "the Cape Cod way of life without risk of further development or of uses inconsistent" with Congress's plan to establish a national seashore there. *Id.* at 1033-34.[5] After the zoning provisions were in place, Congress condemned properties within the six towns for a national seashore. *Id.* at 1034. The owners of the zoned and condemned tracts sought to have the "zoning bylaw set aside for the limited purpose of determining the fair market value of their land and [sought] to have the fair market value of their land determined pursuant to what the zoning provision would have been in the absence

---

[5]The Department of the Interior provided officials in the affected towns with copies of suggested minimum zoning requirements. The Secretary of the Interior drafted legislation so that all zoning ordinances passed by the towns would have to be approved by him. The town planning boards understood "that a bylaw providing for anything less than [the zoning restrictions that the Department of Interior wanted] would not be approved by the Secretary and that they must either adopt [these regulations] or live with the risk of condemnation" by the Government. *Truro*, 476 F. Supp. at 1034.

of federal intervention." *Id.* at 1035. The court found that the new zoning bylaws were "in large part motivated, induced and implemented by agents of the United States," the town's adoption of the zoning provisions "was an integral part of the federal design," and the "federal government should not be allowed to profit from the decreased property values which [those] bylaws effected." *Id.* The court distinguished the *Truro* situation from other instances in which there was no connection between the taking authority and the applicable zoning regulation. The court held that "the federal government [could not] disavow the nexus which existed between its actions and the adoption of the Truro zoning provision," that it was "clear both from the statutory language and the evidence presented at the hearing that Congress made an offer which *Truro* realistically could not refuse," and to "characterize the enactment of the [zoning bylaws] as the totally free act of the Truro citizenry at town meeting would be to shut one's eyes and ears to what really went on." *Id.* The court allowed the affected landowners to introduce evidence of less restrictive town zoning on similar lands outside the proposed national park boundary to establish value. *Id.* at 1036. The court found that the fluctuations in market price attributable to the zoning restrictions were attributable to the project itself, and like any depreciation or appreciation in value due to the impending project, such fluctuations should be excluded in determining value. *Id.*

28

Although *Truro* uses the word "nexus" and never explicitly requires proof of motive or intent, it does not appear to trumpet the broad standard which Appellants advocate. The actions of the Secretary of the Interior were so overt that they arguably evidenced intent and primary purpose. Further, it is clear that the Township was working "in concert" with the Secretary when it passed the zoning restrictions, and the strong arm tactics of the Secretary imply that "but for" the Secretary, the Township would not have passed the restrictions it did. Thus, the facts of *Truro* actually seem to support the standard articulated by the district court.

*Assateague Island* also addressed a national seashore project. 324 F. Supp. 1170. There, Worcester County enacted a moratorium on building permits and restricted sewage disposal permits on Assateague Island at the urging of the Department of Interior to slow development until Congress could consider the development of a national seashore there. *Id.* at 1175-76. Both the moratorium and the sewage permit process were struck down by Maryland courts before the United States ultimately decided to develop a national seashore and sought to take land on Assateague Island by eminent domain. *Id.* at 1177. The landowners argued that the moratorium on building permits and the difficulty in obtaining sewage disposal permits decreased the value of their land. They wished to

29

introduce evidence of land sales in other nearby communities not subject to these restrictions. *Id.* at 1171-72. The court considered sales in other areas not subject to the restrictions. The landowners were not required to show that the Department of Interior's sole motive or purpose in encouraging the restrictions was to depress land value. *Id.* at 1180-81. Further, the court considered the activities of the Government in setting compensation. *Id.*

Unlike the instant case, *Assateague Island* did not involve a zoning restriction which landowners asked a court to disregard; both of the restrictions at issue were struck down by state courts prior to the Government's eminent domain action. The *Assateague Island* court was never faced with the question of the appropriate standard to set aside a zoning restriction; rather, it merely had to consider whether land sales under the restrictions could be used as comparables. Further, in *Assateague Island* there was direct evidence that the Government's primary purpose was to depress property values.[6] Thus, we find *Assateague Island* to be an inappropriate case from which to draw a standard.

---

[6]"The Secretary of the Interior asked the State to defer the building of a bridge 'until Congress has had an opportunity to evaluate the legislative proposals that will soon be placed before it to create a National Seashore' because otherwise the bridge will 'result in a monetary windfall to present property owners' and delaying construction would 'avoid unnecessary inflation and speculation in land values.'" (Appellee Brief, at 18).

Appellants' primary argument for a "nexus standard" is their concern that a primary purpose or intent standard gives the Government a strong incentive to mask its real purpose in passing zoning restrictions behind pretextual assertions of benign purpose. It is very unlikely that the Government would ever admit that its primary purpose or motive in passing an ordinance or regulation was to depress value in anticipation of condemnation. According to Appellants, the Government will be able to benefit by depressing land values as long as they also have *any* other purpose for zoning regulations which would only happen in rare cases. Courts will have to engage in an intense, fact based, exploration of personal correspondence and similar evidence to determine "intent" and "primary purpose" to prohibit such conduct.

Appellants' concerns are valid; however, the "scope of the project" rule is a narrow exception from the general rule that regulations are to be considered in determining a project's "highest and best use." Courts have only applied exceptions to a general takings doctrine when it is necessary to do so in order to protect the rights of both the taking body and the landowner. Bad faith by regulating government entities should be the exception, not the rule. A "mere nexus" rule also endangers the Government's right as a landowner to play a role in

zoning and land use decisions.[7]  As such, we adopt the standard applied by the district court and find that in order to have a zoning restriction excluded from a calculation of a property's value, a landowner must show that the primary purpose of the regulation was to depress the property value of land or that the ordinance was enacted with the specific intent of depressing property value for the purpose of later condemnation

> B.      *Whether a Given Restriction Was Passed for the Primary Purpose of Depressing Property Value is a Matter of Law to Be Decided by the District Court*

Appellants contend that the magistrate and district courts erred when they excluded evidence of the nexus between the Government and the local zoning board from the Commission.  Appellants use our discussion in *320 Acres* to argue that the district court should have tested the sufficiency of Appellants' evidence about the nexus between the Government and the 1981 Overlay, found Appellants' evidence to be sufficient, and submitted the issue to the jury to determine whether the Government interfered in local zoning matters to depress the value of the land

---

[7]There is also a considerable question of fact whether Appellants could even prove a "nexus" if the court were to adopt this standard.  It appears that the Government was merely interested in advancing the same environmental goals as the state.  The Zoning Overlay was passed in 1981, more than eight years before Congress expanded the park, more than eleven years before funding was appropriated, and almost twenty years before the property in question was condemned.  Such a timetable weighs against a nexus.  There does not seem to be anything in the record as overt as the threat-like legislation in *Truro*.

in the area east of Everglades National Park. Appellants misunderstand *320 Acres* and the respective roles of the Commission and the trial judge in a condemnation proceeding.

A court in its discretion may order that the issue of "just compensation" in a condemnation proceeding be determined by a commission of three persons appointed by the court rather than a jury. Fed. R. Civ. P. 71.1(h); *United States v. Reynolds*, 397 U.S. 14, 19 (1970). A district judge has a much broader role in a condemnation proceeding than he does in a conventional jury trial, and except for the single issue of the amount of just compensation, the trial judge decides all issues, legal and factual, arising in a federal condemnation proceeding. *Id.* at 19-20.

Our very lengthy opinion in *320 Acres* supports the district court's actions here. 605 F.2d 762. *320 Acres* discusses the role of the judge and the fact finder in two contexts: (1) the "scope of the project rule" and (2) the "highest and best use." As discussed above, the "scope of the project" rule is designed to ensure that the landowner is neither hurt nor helped in a takings valuation by any action done by the Government within the scope of the project leading to the taking.[8]

_____

[8]For example, if the Government announces that it will establish a park on parcel A, then files an action to take parcel B adjacent to parcel A, the Government should not have to pay for the increased value to parcel A following the Government's park announcement. Likewise, if the Government announces that it will establish a landfill on parcel A, the Government should pay the

33

The "highest and best use" rule ensures that "just compensation" takes into account all the possible and probable uses for a property, not just the use to which the current owner is putting it. A use is not possible and probable if it is prohibited by a zoning regulation that is not likely to change.

In discussing the roles of the judge and the fact finder in the context of "best and highest use," we stated:

> [I]n screening proffered potential uses to ascertain whether there is sufficient evidence of their practicability and probability to warrant submission to the trier of fact, the judge must take into account any regulatory restrictions applicable to the property and the proposed use. And if the judge finds that the regulations preclude the proffered use, he must under Rule 71A(h) exclude evidence of that use from the just compensation determination. . . . A legal restriction either applies to the proposed use or it does not – and that is a quintessential question of law for the judge to decide. . . . [However], if the landowner can demonstrate a "reasonable possibility" that a permit would be issued or that re-zoning will occur, thereby freeing the property for a use which otherwise would be precluded by regulatory restrictions, the owner is entitled to have that 'reasonable possibility' considered by the jury, provided of course that the use is otherwise a practicable and reasonably probable one.

In discussing the distinction in the context of the "scope of the project" rule, we found:

> In sum, the judge decides (a) whether the evidence warrants application of the [scope of the project] rule, (b) how the rule should be applied – i.e., whether or not any change in value attributable to

---

owner of parcel B the amount it was worth before the Government announced the landfill.

34

the project should be included or disregarded, and (c) where appropriate, the date after which any change in value should be disregarded. But whether there in fact has been any increase or decrease in value due to the project, and by how much, is ultimately for the jury (or commission) to decide as part of its just compensation determination on the basis of the evidence presented it.

Read in conjunction with each other, these discussions make clear that it is for the judge, and not the jury or Commission, to decide Appellants' scope of the project type argument that zoning restrictions passed at the behest of the Government in order to lower property value should be excluded in determining "just compensation."

Here, the district court examined the 1981 Overlay and determined that it applied to Appellants' property and there was no "reasonable possibility" that it would change in the near future. In the absence of a "reasonable probability" that the regulation would no longer apply, the Commission did not need to hear any evidence about the value of Appellants' property without the regulation. The district court also determined whether the evidence warranted the application of the scope of the project rule. The district court found that the Government's involvement in the passage of the 1981 Overlay was not within "the scope" of its decision seven years later to expand Everglades National Park or its decision nineteen years later to begin condemning properties. Once the district court

35

decided that the rule should not apply, there was no decision for the Commission

to make. Because the Commission did not need to decide whether there was "any

increase or decrease in value due to the project," there was no need for it to hear

any evidence about the value of land without the regulation or about the

Government's role, if any, in getting the 1981 Overlay passed. The district court

acted correctly in ruling on Appellants' objection regarding the zoning restrictions

as a matter of law and in then excluding evidence regarding this objection from the

fact-finding Commission.

### C.     Due Process During the Land Commission Proceeding

Appellants contend that the Commission was biased against them because

the Commission was exposed to a "long and steady diet of un-rebutted

government presentations" before the Commission heard the instant contested

matter.[9] (Appellants' Brief, at 24). Appellants aver that rather than assessing

Appellants' case on its own individual evidence, the Commission followed the

---

[9]Appellants contend that the Government consolidated very small tracts of land, whose owners were less likely to be represented by counsel, in groups for the earliest Commission trials and then selectively dismissed parcels from those trial groups upon notice of the appearance of counsel. In this way, Appellants argue, the Commission was allowed to hear numerous trials with only a Government evaluation expert. Appellants contend that the courts delayed their proceeding until after these trials by failing to rule on their pretrial motions and refusing to set prompt trial dates despite their repeated protests of prejudice. It ultimately took a court order to secure a trial date. Appellants maintain that the court exacerbated the delays in bringing them to trial by reassigning the trial judge and the magistrate judge.

pattern of awards it had developed in prior cases, $500 per acre in uncontested cases and $700 per acre when the landowner appeared *pro se*, when it awarded Appellants $700 per acre for the vast majority of the relevant property. Appellants maintain that the Commission's failure to reference their expert's 1987 comparable and the Commission's reliance on the Government's 1986 comparable illustrates that the Commissioners had closed their minds to new evidence. This court will address (1) whether the scheduling of Appellants' trial violated due process; and (2) whether the Commission's reaction to the 1987 comparable indicates that it was not considering Appellants' case on the basis of its individual facts.

The Government and the trial court have a duty to "facilitate justice" and guard against due process violations in condemnation proceedings involving a large number of similar land tracts with numerous owners. *320 Acres*, 605 F.2d at 770. Because the protection of a jury is not afforded in Rule 71 Land Commission cases, the courts must be "particularly vigilant to ensure that every precaution is taken to safeguard the rights of individual landowners." *United States v. 5.00 Acres*, 673 F.2d 1244 (11th Cir. 1982). A court may violate constitutional due process if it chooses an adjudication mechanism designed to preclude landowners from producing relevant evidence opposing that offered by the Government. *See*

37

*Sapero v. Mayor & City Council of Baltimore*, 920 A.2d 1061, 1078 (Md. Ct. App. 2007) (holding a court violated due process when it abused state's "quick take" mechanism to take property in absence of real emergency).

Numerous courts have addressed whether it prejudices a landowner who wishes to contest the Government's evaluation of his property, and violates due process rights to have a land commission hear numerous uncontested cases first or at the same time as a contested case. In *5.00 Acres*, the appellants argued that the land commission there had become prejudiced by hearing thirty-nine *pro se* proceedings in which landowners did not effectively present evidence of land values. 673 F.2d at 1247. We found that the landowners had shown no actual bias, much less bias beyond reasonable possibility of disagreement, and stated, "the recitation of numbers proves nothing. The purpose of a commission is to hear all cases for an entire project and achieve some uniformity of result." *Id.*

In *Gwathmey v. United States*, we found that landowners had been denied due process because the Government had consolidated the evaluation of more than 200 tracts of land in one case and did not dismiss the jury to determine the values of each tract until evidence had been presented with regard to all the tracts, making it impossible for the jury to assess the value of each tract of land on the facts addressing that tract. 215 F.2d 148 (5th Cir. 1954). In *75.13 Acres*,

38

landowners claimed a due process violation because the same three commissioners heard all of the condemnation cases involving a particular project. The court rejected this claim and stated:

> The purpose of appointing a commission under Fed. R. Civ. P. 71A(h) is to promote uniformity in compensation by enabling one group of people to establish valuations for all tracts taken in one project. . . . [T]he landowners have not shown that the commissioners were biased against them or failed to consider their case on the basis of their individual facts.

693 F.2d at 817. Our holdings in *Gwathmey* and *5.00 Acres* and the Eighth Circuit's opinion in *75.12 Acres* make clear that having a land commission hear numerous uncontested cases before a contested case is not a per se violation of due process as long as it appears that the Commission evaluated each case on the basis of its individualized facts.

Appellants contend that the Commission failed to consider their case on the basis of their own facts because the Commission's report relied on the Government's 1986 comparable and did not discuss a 1987 comparable which sold for $1,050 per acre and the Commission awarded Appellants a sum similar to what it had awarded in prior cases where the landowners were represented and presented virtually no evidence. The Government contends that given the paucity of proof of the 1987 sale, there was ample basis for the Commission's decision not

to rely on it,[10] and that the Commission issued a sufficient report to justify its ultimate award. As explained above, the instant case turned on the comparable sales offered by each side's expert. The Government's expert offered Comparable 1, a 1986 sale for $700 per acre, just as he had done in numerous prior trials. The Commission had relied upon this sale numerous times in prior trials and did so again in the instant case. Appellants' expert offered the 1987 comparable for $1,050 per acre in the same vicinity to specifically rebut the Government expert's 1986 comparable and to weaken the Government expert's credibility as an appraiser. On cross-examination the Government expert admitted that the 1987 transaction would have figured into his opinion had he known about it. Appellants' counsel reemphasized the Government expert's failure to consider the 1987 transaction in closing argument. In his closing remarks, the Government attorney admitted the 1987 transaction was relevant. Despite all of the emphasis

---

[10]The Government points out that Appellants' own appraiser elected not to use the 1987 sale to determine fair market value and only used it to review and rebut the Government's appraisal based in part on the 1986 comparable. The Government's appraiser stated that he chose not to consider the 1986 comparable in appraising value because the land records book and page number provided by the Appellants' appraiser for the property were not accurate and he could not locate evidence of the sale. Appellants never entered any documentation of the sale into the record. Appellants respond that their appraiser did not use the 1987 case because he felt it was too old but used it to respond to the Government's appraiser who was using other 1980s cases. Appellants also note that the Government conceded that the 1987 transaction was a valid transaction at trial and that no documentation of any sale, 1986 or otherwise, was put into evidence at trial.

on the 1987 transaction at trial, the Commission did not even mention it in its report .

We have extensively reviewed the record and have read several of the Commission's opinions preceding this case along with the Commission's report here. We find ample evidence that the Commission considered this case as well as its prior cases on the basis of their own facts. First, the Commission's opinions illustrate that they awarded different per acre values for various pieces of land within the same proceeding and across proceedings. *Compare* DE 148 app. 1 (awarding $650 for a 1.25 acre plot and a 1.14 acre plot) *with* DE 148 app. 8 (awarding $570 for a 1.14 acre plot and $625 for a 1.25 acre plot). Further, there is also no evidence that the Commission consistently awarded more or less in uncontested cases than it did in cases where the landowner appeared *pro se. See* DE 148 app. 3 (awarding $500 or $520 per acre to three landowners that appeared *pro se* and $698 per acre for a piece of land that was uncontested); DE 148 app. 27 (awarding $800 to *pro se* landowner and between $500 and $1100 per acre to uncontested land owners); DE 148 app. 21 (awarding $1400 to landowner with counsel but without expert, $700 per acre to *pro se* landowner, and between $500 and $1200 per acre in cases where landowner did not contest). Second, the Commission provided a far more detailed report here than they provided in prior

uncontested hearings. Third, the Commission's ultimate $700 award was higher than the $500 per acre amount requested by the Government and awarded in earlier proceedings for similar property. The Commission's decision not to rely upon the 1987 comparable, which Appellants presented as rebuttal rather than in their case an chief, does not alone illustrate that the Commission failed to consider Appellants' case on the basis of its own facts nor does the Commission's decision not to address the 1987 comparable in its report.

We addressed the requirements for a land commission report in detail in *United States v. 0.21 Acres of Land*, 803 F.2d 620 (11th Cir. 1986). There, we found that a land commission report is insufficient if it "merely states that the award constitutes just compensation," without more or "merely summarizes the evidence without providing the commission's analysis." *Id.* at 623.

> [T]he report must indicate the valuation technique employed and the evidence relied on by the commission . . . [as well as] how the commission resolved significant factual disputes and how the resolution affected its determination. Furthermore, the commission may need to explain why it believed certain witnesses and discredited other evidence if substantial evidence conflicts with its conclusion. However, the commission need not provide an overly particularized report . . . . [T]he commission need not make detailed findings such as judges do who try a case without a jury. Instead they should reveal the reasoning they use in deciding on a particular award . . . . In short, the commission need indicate only the basis for its award so that the district court can determine whether the award is clearly erroneous.

42

*Id.* (internal citations and quotations omitted). Here, the Commission report

"indicate[d] the valuation method the Commission employed, the evidence it

found compelling, and the other factors it considered important." *0.21 Acres*, 803

F.2d at 624. While the Commission likely should have explained why it did not

rely upon the informative, if disputed, 1987 comparable, the Commission's failure

to do so does not support the conclusion that it failed to consider Appellants' case

on the basis of its individual facts.

## III.  Conclusion

The Land Commission used an acceptable resolution mechanism to obtain

uniform results across trials and issued a thoughtful and detailed report.

Appellants have not been denied due process, and the district court did not err in

deciding that the Commission was not biased and in refusing to grant Appellants a

new trial. For these reasons, we AFFIRM.